**D. KENNETH SARGEANT, et al., Plaintiffs**

**v.**

**THE GOVERNMENT OF THE VIRGIN ISLANDS, Defendant**

Civil No. 275-1970

District Court of the Virgin Islands

Div. of St. Thomas and St. John

October 30, 1973

CHRISTIAN, *Chief Judge*

### MEMORANDUM AND ORDER

This action was tried to the court sitting without a jury on April 10, 1973, plaintiffs' cause having been presented by GRUNERT, STOUT, HYMES and MAYER (James L. Hymes, III, Esquire, of counsel), and defendant having been represented by the Office of the Attorney General of the Virgin Islands (Donald M. Bouton, Esquire, of counsel).

The bone of contention between the parties is a contract for architectural services in designing a proposed government office center, executed on October 9, 1963. It is conceded that plaintiffs satisfactorily completed performance under the contract, and that they received the sum of $160,000 from defendant for their services. Plaintiffs contend, however, that additional sums are due them under an escalator clause in the contract, operative by reason of the increase in the final estimated construction cost of the project over the alleged original estimate. Defendant denies liability for any excess fee and counterclaims for the monies paid, alleging that no appropriation for the architect's fee was ever made by the legislature, as required by the Revised Organic Act, § 3, Title 31 V.I.C. § 249, and Title 33 V.I.C. § 3101.

Because the counterclaim goes to the validity of the contract, it is appropriate to treat it first.

The contract was negotiated for plaintiff's firm by Thomas Crenshaw and an associate, Kenneth Nidtree, and

Commissioners James Houston and Mario Lewis on behalf of the government. It was signed by Commissioner Lewis and approved by the then Governor, the Honorable Ralph M. Paiewonsky, on the one side, and by Lionel S. Fernandez and John H. Dierlien on the other. In addition, the legislature passed three resolutions in connection with the project. The first, No. 216, passed on January 17, 1963, authorized the filing of an application with the Federal Government for "an advance" under 40 U.S.C. § 462 to "Provide for the Planning of Public Works" specifically a government office center. That Resolution included the following language:

That if such an advance be made, the applicant shall provide or make necessary arrangements to provide such funds, in addition to the advance, as may be required to defray the cost of the plan preparation of such public works.

Pursuant to this authorization, it appears that an application was made and the sum of $160,000 was tentatively approved as an advance to the Government of the Virgin Islands for the architectural phase of the project, by the Housing and Home Finance Agency, Community Facilities Administration of the United States government.

██ ██ On June 17, 1963, the local legislature passed a second resolution, No. 243 authorizing the acceptance of the federal offer. The passage of this resolution was followed by the execution of the instant contract and performance thereunder by plaintiffs. Then, on December 1, 1966, came the third resolution of the Virgin Islands' Legislature. That resolution, No. 362, following the form prescribed by the H.H.F.A., purports to approve the planning documents submitted by plaintiffs, and the statements made on Form CFA-430, submitted to the H.H.F.A., as a final statement of costs and plans for the project. The latter form made reference to an "anticipated increase in the architect-engineer fee" and seemed to estimate a total of $280,000 for that aspect of the project. Relying on these

resolutions, plaintiffs argue that the legislature authorized the contract and expenditures incident thereto, although conceding that no formal appropriation was ever passed. That the legislature authorized and approved the project is clear, but the requirements of the Organic Act and of the pertinent statutes—that no contracts be executed except in conformity with legislative appropriations of funds,— are not thereby satisfied. This court has previously had occasion to consider the legal significance of a similar resolution, and the following, at least, is clear—that a resolution, the subject matter of which is not specified in the governor's call for the session or in any special message sent by him to the legislature, *or* that is not approved by the governor or passed over his veto, does not acquire the force of law. Government of the Virgin Islands, et al. v. Massac, et al., 3 V.I.R. 328, 161 F.Supp. 704 (1958); Huntt v. Govt., 6 V.I.R. 48, 382 F.2d 38 (3 Cir. 1967). Certainly then, a mere resolution cannot satisfy the fundamental requirement of an appropriation. This analysis comports with the views prevailing in other jurisdictions— to the extent that this relatively unusual question has been dealt with—and it is supported by sound reason. A resolution does not require all the formalities of a general ordinance, and matters as important as appropriations from the public treasury ought not to be determined without thorough legislative (and executive) consideration, e.g. Hawks v. Bland, 9 P.2d 720 (Okla. 1932).

The consequence of this defect or omission is that to the extent that local funds are in issue, the contract is void. This conclusion is inescapable in light on the congruence of § 3 of the Revised Organic Act, which forbids payment out of the Virgin Islands Treasury except pursuant to an Act of Congress or a "money bill" of the local legislature, and §§ 248 and 249 of Title 31 of the Virgin Islands Code, which provide that no contract "on behalf of the govern-

ment shall be made unless the same is authorized by law or is under an appropriation adequate to its fulfillment", and further specify that any purported contract in violation of the chapter "shall be null and ineffective." Moreover, this principle is almost universally applied when contracts between private persons and governments, violative of state constitutions and statutes, are presented to the courts for enforcement, Govt. of the Virgin Islands v. Ottley, et al., Civ. No. 3/1970; Civ. No. 284/1970; Civ. No. 58/1970; District Court of the Virgin Islands, Division of St. Thomas and St. John (Contracts found void for noncompliance with statutory bidding requirement); Yokley v. Clark, 135 S.E.2d 564 (N.C. 1964) (Contract void for violation of constitutional requirement that towns submit proposed expenditures of tax revenues to public vote); Armco Drainage & Metal Prod. v. County of Pinellas, 137 S.2d 234 (Fla. 1962) (Bidding requirement); County Bd. of Ed. of Coffee County v. City of Elba, 135 S.2d 812 (Ala. 1961) (Constitutional debt limit exceeded); Gamewell Co. v. City of Phoenix, 216 F.2d 928 (9 Cir. 1954) (Applying Arizona Law, bidding violation); Hudson City Contracting Co. v. Jersey City Incinerator Authority, 111 A.2d 385 (N.J. 1955) (Bidding violation); State Highway Comm. v. City of Aztec, 424 P.2d 801 (N.M. 1967) (Noncompliance with constitutional requirement of ordinance, levy of tax, and vote of electors); Dynamic Industries Co. v. City of Long Beach, 323 P.2d 768 (Cal. 1958) (Violation of city charter requiring city manager's signature on contract); Gillette-Herzog Mfg. Co. v. Canyon County, 85 F. 396 (D.C. Idaho 1898) (Violation of statute forbidding cities to incur indebtedness in excess of revenues for year without approval of two-thirds of voters). Admittedly, one or two jurisdictions evidently take the contrary view, Cravens v. U.S., 163 F.Supp. 309 (W.D. Ark. 1958); City of Shamrock v. Hrnciar, 453 S.W.2d 898 (Tex. 1970), but they represent

a small minority and their reasoning is less persuasive than that of the host of cases contrary. Indeed, the U.S. Court of Claims follows the majority rule with respect to violations of mere procurement regulations, Schoenbrod v. U.S., 410 F.2d 400 (Ct. Cl. 1969).

The foregoing notwithstanding, I am not convinced that the government is correct in its contention that the invalidity goes to the expenditure of federal as well as local funds. The Organic Act and the statutes cited above are intended to protect the local treasury from fiscal mismanagement, unauthorized expenditures, and generally to insure the functions of the legislature in dispensing local revenues from encroachments by the executive branch of government. These purposes have no connection with the federal treasury. Of course, when federal funds are covered into the Virgin Islands treasury for disbursement in matters which may require discretionary allocation, the restrictions may follow such funds, but I note that a recent amendment to § 249 has specifically articulated the qualification I allude to:

> The provisions of this chapter shall not apply to purchase orders or contracts where Federal funds are involved, and where federal law, rules or regulations apply to the procurement of supplies, materials, equipment or contractual services in the Virgin Islands. (Amended April 16, 1971, No. 2995, § 2, Sess. L. 1971, p. 115.)

I do not deem this amendment applicable per se to the instant transaction, which predates it substantially, but I do view the amendment as a clarification of an implicit reservation in the original text. That the Organic Act and statutory restrictions as applied to specifically allocated federal funds would be nonfunctional is perfectly clear in the instant situation. Here a specific sum was set by the H.H.F.A. as a maximum contribution to a particular project. Prior to disbursement, numerous forms had to be submitted to that agency for approval, including a complete

set of the final planning documents and specifications, prepared by plaintiffs. Detailed information on anticipated costs, plans for financing and construction, all had to be furnished to that federal agency before it certified the advance—to be paid from its federal appropriation. Thus, no federal monies were advanced until the designated federal agency had received copies of plaintiffs' work product, and presumably until it had satisfied itself of the propriety of the expenditure. On these facts, I am ineluctably led to the conclusion that the Government of the Virgin Islands was, at that point, totally without discretion to appropriate those federal funds to any other purpose or to any other recipient—the advance having been specifically conditioned on federal approval of the documents prepared by plaintiffs.

It is no novel analysis, distinguishing between local and federal funds for purposes of applying constitutional or basic restrictions on expenditures (see e.g. Yokley v. Clark, supra, p. 568), and based upon the reasoning I have outlined, I conclude that such a distinction is proper on these facts. Accordingly, I hold that the contract is illegal and void to the extent that it purports to encumber territorial revenues without a legislative appropriation therefor. To the extent that it encumbers federal funds, however, I hold that it is valid, and I perceive no difficulty in treating the contract as divisible in this manner, as the parties clearly constructed it upon just such a division, Restatement of Contracts § 607, Comment (a).

Plaintiffs urge that, in this posture, the doctrines of estoppel and/or recovery in quantum meruit should be applied. The estoppel argument suggests that to allow the government to deny the validity of the contract, after its agents misled the plaintiffs into believing they were authorized to bind the government, "would dignify, if not sanctify, fraud, bad faith, disregard for contractual obliga-

251

tions, and a gross injustice," (Plaintiffs' Post Trial Memorandum of Law, p. 8). At first blush this seems true. Some courts have indeed applied the doctrine of estoppel to situations analogous to the one before this court on very similar notions of justice, Cravens v. U.S., supra; People ex rel. Amer. Nat. B & T Co. of Chicago v. Smith, 249 N.E.2d 232 (Ill. 1969) City of Nederland v. Callihan, 299 S.W.2d 380 (Tex. 1957).[1]

■ This court, however, has tilted strongly toward the contrary majority position denying the applicability of estoppel where a contract with the government is executed in violation of statutory or constitutional requirements, particularly where the public treasury is to be charged. In Govt. v. Ottley, supra, we denied application of the estoppel against the government in the context of a violation of a statute requiring bidding. The reasoning there employed is equally convincing here. If the executive agencies may execute contracts in violation of specific statutory prohibitions, enacted to safeguard public revenues, and if such contracts shall then be enforceable in spite of the statutes "life and vitality" would be "entirely destroyed", Govt. v. Ottley, supra, Memorandum, March 7, 1972, p. 3. The court announced in Ottley, that § 249 was to be strictly interpreted and that admonition shall be firmly enforced. In this unrelenting stance, we are nurtured by the similar position taken in a formidable array of jurisdictions. Schoenbrod v. U.S., supra; Nehf v. U.S., 302 F.Supp. 356 (E.D. Ill. 1969); Shotwell v. U.S., 163 F.Supp. 907 (E.D. Wash. 1958); Dynamic Industries Co. v. City of Long Beach, supra; Martin v. Alcoholic Bev. Control Appeals Bd., 341 P.2d (Cal. 1959); Slurzberg v. Bayonne, 148 A.2d 171 (N.J. 1959); Sorenti v. Bd. of Apps. of Wellesley, 187 N.E.2d 499 (Mass.

---

[1] However, both Cravens and Callihan are from the few jurisdictions which stray from the majority rule on the validity of such contracts, and Smith may be in question as good law, at least where public revenues are involved, James v. Ill. Dept. of Pub. Aid, 261 N.E.2d 420 (Ill. 1970).

1963) ; Armco Drainage & Metal Prod. v. County of Pinellas, supra; County B. of Ed. of Coffee County v. City of Elba, supra; State v. Legget, 359 S.W.2d 790 (Mo. 1962). The same authorities and the same rationale require the rejection of plaintiffs' plea in quantum meruit. Ottley rejected that circumnavigation of § 249, and the remedy is foreclosed, in my judgment, in these circumstances as well.

■ Although these conclusions may redound harshly in contrast to plaintiffs' reliance on fair play, there are very well founded reasons why they must prevail. Plaintiffs seek the intervention of the court on principles of equity, but the true equities of a cause are not devined by simplistic formulae. First, there is the element of bona fides. Plaintiffs would intimate that they are the innocent, good faith victims of governmental conduct of which they could not be expected to be cognizant, and hence they merit the court's protection. But it is elementary among legal principles that the law as embodied in statutes is ipso facto constructive notice to all, of its contents. Thus, "anyone dealing with a government agent is held to have notice of the limits of his lawful authority," and, of course, a "lack of authority in the agent", certainly where the other party knows or should know of it, and such knowledge, even if implied, "is fatal to any claim of estoppel based upon the agent's conduct . . . ," Shotwell v. U.S., supra, at p. 915. On this reasoning, plaintiffs had at least constructive notice of the limits within which the officials and agents of the Government of the Virgin Islands must operate, and charged with this knowledge, they come to the court of equity without the bona fides they would claim in this transaction.

There is a second reason why the remedies of equity cannot so easily be invoked here. In the narrow context of justness as between plaintiffs and the government officials with whom they dealt, the equitableness assuredly weighs in favor of the former. But the defendant in this law suit is

253

the Virgin Islands Government, holding forth as the legal representative of all of its people. Viewed in this larger perspective, the mistakes or failures of a few governmental officers are less weighty, and the right of the public not to be charged with large debts contracted in direct violation of the law takes a significant place in the equation. The Supreme Court was, I believe, addressing this concern in the case of Fed. Crop. Ins. Corp. v. Merrill, 332 U.S. 380 (1947) when it stated:

> Whatever the form in which the government functions, anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority . . . .

> The oft-quoted observation in Rock Island, Arkansas & Louisiana R.R. Co. v. U.S., 254 U.S. 141, 143, that "Men must turn square corners when they deal with the government," does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury. (P. 385.)

Parenthetically, it should be noted that some courts have, in like circumstances, permitted the plaintiff to recover the items furnished under the void contract. There are several reasons why that remedy is not appropriate in this case, however. First, and most important, plaintiffs have received a significant sum of money in consideration of their services, the final adequacy or inadequacy of that sum notwithstanding, and it would be fruitless to attempt to fragment the plans so that a portion might be retained and a portion returned. Further, plaintiffs have never requested the restitution to the firm of the plans should money damages be denied, and I believe the reason is apparent—they would be of no benefit to plaintiffs, having been specially designed for a single customer. Thus, no order of restitution will be entered.

Let judgment enter in accordance with the views expressed herein.