# GEORGE HORWITZ, JUDITH HORWITZ and JULIO L. DANIEL, Plaintiffs

## v.

# GOVERNMENT OF THE VIRGIN ISLANDS, Defendant

Civil No. 78-35

District Court of the Virgin Islands

Div. of St. Thomas and St. John

May 30, 1980

PETER A. MARTIN, ESQ. (DUDLEY, MARTIN & DUDLEY), St. Thomas, V.I., *for plaintiffs*

IVE ARLINGTON SWAN, ESQ., Attorney General of the Virgin Islands, EDWARD A. WASCOE, Assistant Attorney General (Department of Law), St. Thomas, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

## OPINION

This class action is before the Court following a court trial on January 28th and 29th, 1980, and closing arguments on February 1, 1980. The determinative issue is the plaintiffs' contention that the Government is estopped from challenging the legality of contracts it entered into with plaintiffs for the sale of townhouses at Estate Nazareth. The plaintiffs' argument must fail because the following three ingredients essential to their estoppel theory are absent: (1) the officials who entered the contracts on behalf of the Government must act within the scope of their authority; (2) the plaintiffs must be ignorant of the facts constituting the illegality of their contracts; and (3) the plaintiffs must detrimentally rely on the conduct of Government officials. Accordingly, the Government will not be estopped from asserting the illegality of the sales contracts and the plaintiffs' claims will not succeed.

The cause arises out of a plan to construct middle income housing at Estate Nazareth, St. Thomas. The plaintiffs are individuals who, prior to January 15, 1975, each deposited $1,000.00 with the Department of Housing and Community Renewal as a downpayment

on a proposed townhouse unit. In addition to the deposit, each plaintiff signed a Purchase and Sale Contract for a two, three or four bedroom dwelling at the Nazareth project. (See, e.g., Exh. 9.) Each contract was also signed by Darwin Creque as Commissioner of Housing.

Due to Government funding difficulties as well as the late Governor Cyril King's growing disaffection with the townhouse concept, the Nazareth project was abandoned. The parties have stipulated that the breach, if any, of the sales contracts resulting from the discarding of the project occurred on January 15, 1980. The Government did offer to return the plaintiffs' deposits in exchange for their signatures on release forms. The vast majority of plaintiffs acceded to this request and obtained their money. The plaintiffs now seek damages representing the difference between the purchase prices stated in their contracts and the market value of comparable housing which they could have undertaken to buy in 1975.

In F. D. Rich Housing of the Virgin Islands, Inc. v. Government, 17 V.I. 410 (D.V.I. 1980), this Court held that Rich's Agreement with the Government for the construction of the Nazareth project was illegal. The Court relied on three distinct illegal aspects of the Agreement: (1) the Agreement violated 33 V.I.C. § 3101 because it created Government financial obligations in excess of appropriations; (2) the Agreement violated Act 3088, 1971 V.I. Sess. Laws at 313–314, because the Government never adopted a Housing Development Plan for the Nazareth project; and (3) the Agreement failed to comply with the cost limitations on middle income housing established by 29 V.I.C. § 191n. The Government now contends that the Rich holding compels the conclusion that the Government's contracts with plaintiffs for dwellings at the Nazareth project are also illegal. The plaintiffs counter with two assertions. Initially, they maintain that the Rich decision is irrelevant to the validity of their contracts. Alternatively, they argue that the Government is estopped from asserting the illegality defense.

■ Plaintiffs' argument as to the materiality of the Rich decision can be dismissed summarily. Firstly, the plaintiffs' contracts were so intertwined with the Rich-Government Agreement that they could not exist independently of it. The testimony at trial was clear that the plaintiffs' entire concept of what they were purchasing originated from such items as the specifications, plans (exhibits 3 and 4) and even a model (exhibit 2) developed for and made a part of

468

the Rich-Government Agreement. (See also the Parties Agreed Stipulation of Facts, # 3.) In fact, the central thrust of the plaintiffs' response to the Government defense that the contracts are too vague is that the details may be gleaned from the Rich-Government Agreement. Accordingly, the plaintiffs' theory that if the Rich-Government Agreement failed, their contracts still obligated the Government to find an alternative developer has little merit.

■ Regardless of the extent of the interrelationship of the contracts, however, the plaintiffs' sales contracts are illegal standing by themselves. In effect, each of the three illegal characteristics of the Rich-Government Agreement are also inherent in the plaintiffs' contracts.[1] Specifically, the absence of adequate appropriations for the project as required by 33 V.I.C. § 3101 signifies that the Government could not obligate itself to construct the townhouses for subsequent sales to the plaintiffs. Similarly, the nonexistence of a Housing Development Plan for the Nazareth project as mandated by Act 3088 prevents the Government from legally entering contracts to sell units at the project. Finally, the fact that the terms of the plaintiffs' contracts violate the cost limitations on middle income housing established by 29 V.I.C. § 191n[2] also invalidates the contracts. Thus, the plaintiffs can prevail only if the Government is estopped from relying upon its illegality defenses.

There are six conditions which must be met before estoppel may be found against the Government. The first two are unique to matters involving the Government:

(1) There must be a waiver of sovereign immunity to suit; and

(2) The agent whose conduct is relied upon to work an estoppel must have acted within the scope of his authority lawfully conferred.

United States v. Georgia Pacific Co., 421 F.2d 92, 100–101 (9th Cir. 1970). 1 GOVERNMENT CONTRACTS § 4.100 at 4-64 (1979). The remaining elements are general estoppel principles:

---

[1] For a detailed discussion of the legal requirements and their applicability to the facts of the case at bar, see F. D. Rich Housing of the Virgin Islands, Inc. v. Government, 17 V.I. 410 (D.V.I. 1980).

[2] § 191n. COST LIMITATIONS
 (a) No dwelling shall be erected by the Government at a cost of more than $25,000 exclusive of the proportional cost of land.
 (b) The minimum selling price for a dwelling shall be a sum at least equal to the Government's acquisition cost plus the cost of any additions and improvements.

(3) The party to be estopped must know the facts;

(4) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(5) The latter must be ignorant of the facts; and

(6) The party seeking estoppel must rely on the former's conduct to his injury.

United States v. Georgia Pacific Co., 421 F.2d at 96.

 The first element, waiver of sovereign immunity, is established if the Government's potential liability arises from its acting in its proprietary rather than sovereign capacity. See id. at 100. Although frequently blurred, the essential distinction is that in its proprietary role the Government is acting as a private concern would, while in its sovereign role the Government is carrying out its unique governmental functions for the benefit of the entire public. Id. at 101. Generally speaking,

> [w]hen the government enters into a contract with an individual or corporation, it divests itself of its sovereign character as to that particular transaction and takes that of an ordinary citizen and submits to the same law as governs individuals under like circumstances.

United States v. A. Bently & Sons Co., 293 F. 229, 235 (S.D. Ohio 1923). Accord: United States v. Georgia Pacific Co., 421 F.2d at 101; McQuagge v. United States, 197 F.Supp. 460, 469 (W.D. La. 1961). However, since the case at bar will be decided on other grounds, the Court will make no determination as to the validity of the sovereign/proprietary distinction in general, nor as to its specific applicability to the sales contracts in question.

 As to the second prerequisite for estoppel, the types of illegality as to which the plaintiffs' contracts succumb clearly indicate that the representatives of the Department of Housing who negotiated the contracts lacked the authority to take such action. This Court specifically addressed the issue of authority in Sargeant v. Government, 10 V.I. .245 (D.V.I. 1973). Sargeant involved the absence of an appropriation to support a Government contract with an architect:

> This Court, however, has tilted strongly toward the contrary majority position denying the applicability of estoppel where a contract with the government is executed in violation of

statutory or constitutional requirements, particularly where the public treasury is to be charged.

Id. at 252. Thus the two illegalities posing dangers to the public fisc, the requirement of adequate appropriations and the statutory cost limitations on middle income housing, are extremely pertinent to the case at bar. Of course, the absence of a Housing Development Plan is also fatal. Thus, the doctrine of estoppel is ineffective as to the plaintiffs' claims since they are premised on the unauthorized acts of Government agents. See Reconstruction Finance Corp. v. Martin Dennis Co., 195 F.2d 698, 703 (3d Cir. 1952); Samford, Inc. v. United States, 410 F.2d 782 (Ct. Cl. 1969); Sargeant v. Government, 10 V.I. at 252.

■■ The plaintiffs successfully establish the next two required factors that the Government, as the party to be estopped, knew the relevant facts and intended the plaintiffs to rely on its representations. The Government's knowledge of the facts underlying the illegalities can be inferred from its possession of all the relevant information. The Government's intent that the plaintiffs act upon its representations follows from the Government's active role in sending out letters soliciting purchasers and subsequently negotiating the sales contracts.

■■ However, the plaintiffs are unable to establish the fifth item essential to their estoppel theory; they were not ignorant of the facts constituting the illegality of their sales contracts. As a preliminary matter, it is well established that the plaintiffs cannot rely on any ignorance of the state of the law and its effect on limiting an official's authority. See Federal Crop Insurance Corp. v. Merrill, 322 U.S. 380 (1947).[3] This is particularly true in the case at bar since paragraph 6 of the sales contracts (exhibit 8) refers to the applicability of 29 V.I.C. § 191 et seq. and "other statutory provisions." In effect, the reference implies that the plaintiffs had constructive knowledge of the relevant provisions. 1 GOVERNMENT CONTRACTS § 4.100 at 4-77.

In all fairness to plaintiffs, however, their theory concentrates on their ignorance of the facts rather than the law. They maintain that "the illegalities being argued in this case are so *factually* technical and complex that the plaintiffs could not have realistically learned

---

[3] Merrill deals with regulations published in the Federal Register which, like the legislative enactments relevant to the case at bar, are in the public domain but are rarely common knowledge.

of their existence."[4] However, close analysis of the illegal aspects of the sales contracts yields a contrary conclusion.

The plaintiffs' strongest argument can be made for the inadequacy of appropriations. To be properly aware of this insufficiency the plaintiffs would require extensive information not readily available as to the cost of the site work and other Government financial obligations under the Rich-Government Agreement. Also, the legal uncertainties as to what constitutes an appropriation suggest that the plaintiffs were not in a position to judge the validity of the Agreement.

■ Yet the contention that the illegalities are too complex for the average citizen to discern collapses as to the remaining two illegalities. Act 3088 expressly requires the adoption of a Housing Development Plan and it requires no legal expertise to determine that none exists. Similarly, 29 V.I.C. § 191n, which is specifically referred to in the sales contracts, states that $25,000 is the maximum price for middle income housing sponsored by the Government. Thus, even if the plaintiffs were completely unaware of the proper application of § 191n as discussed in the Rich Opinion,[5] at the very least those purchasing 4-bedroom townhouses for $26,500 (see exhibit 7) must have been on notice of a potential problem. In fact, 69 of the approximately 100 purchasers constituting the plaintiff class purchased such 4-bedroom units. (Stipulation 12, Agreed Stipulation of Facts.) Moreover, as to the requirement of § 191n that the sales price be at least equal to the Government's acquisition cost plus the cost of any improvements, the plaintiffs' knowledge of the interrelationship of their purchases with the Rich-Government Agreement suggests that they had a factual basis for determining compliance with this provision.

Of course, the Court does not envision the plaintiffs as instant legal geniuses. However, it is not unreasonable to expect that purchasers of middle income housing for approximately $25,000 in

---

[4] See Plaintiffs' February 6, 1980, Post-Trial Memorandum at 2. Unfortunately, the case cited by the plaintiffs to illustrate such "exceptional circumstances," Essex v. New England Telegraph Co., 239 U.S. 313 (1915), is totally inapposite to the case at bar. The Essex Court estopped a town from asserting a very technical statutory illegality and interfering with telegraph lines whose construction and use had been acquiesced in 29 years earlier. Id. at 319. In contrast, the case sub judice involves statutory illegalities of central importance and the plaintiffs cannot claim a reliance interest of such magnitude, if at all.

[5] This Court held in Rich that the proportional cost of site work performed by the Government must be added to the purchase price of the units for purposes of analysis under § 191n.

1973–1974 would utilize the services of an attorney. Such a minor precaution might have prevented the inconveniences the plaintiffs ultimately suffered.

 Finally, the plaintiffs' estoppel argument fails because they did not rely to their detriment on Government representations as to the legality of their contracts. See Emeco Industries, Inc. v. United States, 485 F.2d at 659; Dana Corp. v. United States, 470 F.2d 1032, 1045 (Ct. Cl. 1972) (per curiam). To be sure, the plaintiffs relied on the Government's conduct to the extent they made deposits of $1,000 apiece. Nevertheless, the plaintiffs did not present evidence suggesting that they refrained from making alternative purchases. In fact, such abstinence is unlikely since the plaintiffs did not expect to move into their homes for an extended period because of the time it would take to construct the Nazareth project. Moreover, proof of foregone purchases alone would have been insufficient; the plaintiffs also failed to show that they incurred a financial loss because of missed opportunities to purchase alternative housing. In effect,

> [i]mplied in the Court of Claims decisions is that mere inaction or possibility without a corresponding change in the contractor's position operates to bar estoppel against the Government.

1 GOVERNMENT CONTRACTS § 4.100 at 4-89; citing Tecoa Corp. v. United States, 411 F.2d 1262 (Ct. Cl. 1969); Williamsburg Drapery Co. v. United States, 369 F.2d 729 (Ct. Cl. 1966).

 Instead, the plaintiffs' entire proof on the issue of damages is focused on the difference between the original purchase prices and the market value of comparable housing at the time of breach. See Wolff v. Cohen, 379 F.2d 477, 479 (D.C. Cir. 1967). Yet this damage claim does not represent a loss because the plaintiffs detrimentally relied upon the Government; rather, the sum is largely the result of the plaintiffs missing out on what by all accounts was to have been a bargain purchase at the Government's expense. Surely, the lost profits sought by plaintiffs is not the type of injury the equitable doctrine of estoppel is designed to remedy. See, e.g., Emeco Industries, Inc. v. United States, 485 F.2d 652. Instead, the doctrine of estoppel is intended to redress the loss incurred due to detrimental reliance and, therefore, place the plaintiffs in the position they would be in, absent the contracts. See RESTATE-MENT (SECOND) OF TORTS § 90 Comment d (Tent. Draft 1973). The plaintiffs reached that status as soon as they recovered their deposits. At that point, they could enter the real estate market and

purchase a dwelling at normal market prices. Thus, justice in no way requires the plaintiffs to receive damages.

The Government will submit a proposed Judgment Order dismissing the plaintiffs' claims.