Casky, C. J.,
delivered the opinion of the court.
The act of Congress making appropriations for sundry- expenses of the government, approved March 2, 1865, contained the following provision:
“For an enlargement of the library of Congress so as' to include two wings, built fire-proof, the space at either end of the present •library, measuring about eighty feet in length by abouj; thirty feet in width, in accordance with a plan to be-approved by the Committee on the Library, one hundred and sixty thousand dollars, to be expended under the direction of the Secretary of the Interior.'’
Mr. Usher, who was then Secretary of the Interior, directed the architect of the Capitol extension, Mr. Thomas U. Walter, to prepare plans in accordance with this law. These plans were approved by the Joint Committee on the Library, and on the 14th of April, 1865, circular letters were sent to all the principal establishments making the kind of work required, containing plans and specifications of the enlargement of the rooms, and inviting from them proposals for the necessary, work and materials required ; such proposals to be put in on or before the 26th day of April, 1865. A number of bids were received, among others that of the claimant, proposing to furnish all the material and perform all the work required for the sum of $169,900. These proposals were submitted to Senator Oollamer, chairman of the Joint-Committee on the Library, Congress not being in session, who advised that the bid of Mr. Fowler be accepted. The architect concurred in this recommendation, and thereupon the Secretary directed the architect to enter into a written contract with Mr. Fowler, which was accordingly done.
This contract was executed on the 12th day of May, 1865, and the claimant immediately entered upon its performance. He prepared materials and performed labor to the amount of five thousand five hundred and twenty-two dollars and forty-eight cents, ($5,522 48,) and which materials were worth to him, after the rescission of the contract, the sum of three thousand one hundred and forty dollars and nine cents, ($3,140 09.)
About this time Mr. Usher retired from the Department of the Interior, and Hon. James Harlan became his successor. Mr. Harlan, on the 25th May, 1865, notified the claimant that his contract would be held void, because no advertisement for proposals had been published as required by law, and that no accounts' or claims for work performed or materials furnished under the contract wonld be allowed. Mr. Fowler thereupon ceased work, giving notice that he was fully *46 prepared to perform bis contract, and expected the government to live up to its part of it, or respond to him in damages for breach of it.
Proposals were then advertised in the newspapers, and the contract was relet to the Architectural Iron Works at about $146,000.
The actual cost of performing the'work, according to the evidence, was $130,747. The difference between that sum and the contract price is claimed as damages for the breach.
The United States, by their Solicitor, resist a recovery, on the ground that the contract, made with claimant under the authority of Secretary Usher, was void by reason of the following acts of Congress :
On the 2d day of March,, 1861, Congress passed the following statute :
“All purchases and contracts for supplies or services in any of the departments of the government, except for personal services, when the public exigencies do not require the immediate delivery of the article or articles, or performance of the same, shall be made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or performance is required by the public exigency, the articles or service required may he procured by open purchase or contract at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals. No contract or purchase shall hereafter be made unless the same be authorized by law, or be under an appropriation adequate to its fulfilment, except in the War and Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.” (12 Stat., 220.)
The language of the statute of May 1, 1820-, sec. 6, is—
“That no contract shall hereafter be made by the Secretary of State, or of the Treasury, or of the Department of War, or of the Navy, except under a law authorizing the same, or under an appropriation adequate to its fulfilment;, and excepting also contracts for the-subsistence and clothing of the army or navy, and contracts by the quartermasters’ department, which may be made by the Secretaries of those departments.” (3 Stat., 50S.) "
Upon these facts the court held—
1. That the contract between the claimant and the United States was a valid and binding contract.
2. That it was not subject to the provisions of the act of 2d March, 1861, being specially confided to the judgment and discretion of the Secretary of the Interior, under the advice and approval of the joint committee of Congress, by the act directing the work to be done.
3. It did not come within the prohibition of the act of May 1, *47 1820, as there was a law authorizing the work to be done, although the appropriation was not entirely adequate to its fulfilment.
4. That the annulment of the claimant’s contract was unauthorized and unlawful, and he is entitled to recover such damages as he has sustained by reason of the violation of the agreement. ■
5. That the measure, of damages is the difference between what the work would have cost and the price the claimant was to have received for its performance, deducting therefrom for his -time, trouble, risk, and use of capital, from which he was relieved by the annulment.
The main question discussed in this case has been whether the contract entered into under the direction of Secretary Usher with the claimant was a valid and binding contract as against the United States. Secretary Harlan assumed that it was null and void, and that he had the power and authority to so declare. That assumption was based on the facts that there had been no such advertisement for proposals as the law requires, and that there was no law authorizing such a contract, or any appropriation, adequate to its fulfilment.
In what instances an advertisement is necessary, and how far its omission by the officer charged with making the contract will affect the validity of the agreement made, are matters that have given rise to much discussion and difference of opinion in this .court. It is still unsettled whether the mandate in the act to advertise is prescribed as a rule of conduct for the officer whose duty it is to make the contract, .or whether it enters into the agreement as a condition of its validity. Or, where the officer has decided that an exigency exists which justifies him in omitting the advertisement, is the other party bound to know and inquire into the soundness of that opinion, or the existence of such a state of facts as will support it? Is the court or the reviewing officer in such case to re-examine the foundation and accuracy of the conclusion reached? If-so, what constitutes an exigency? By what amount of public interest, convenience, or necessity is it to be determined ? If founded upon state secrets, military or diplomatic, how is the party, who is to judge of them at his peril, to know anything of them ? Or, how can he be informed of the facts supposed to create such exigency? Some of us think these considerations show that Congress meant to prescribe as a-general rule of conduct to contracting officers, the duty of advertising, leaving such officers, in each instance, to judge of whether the exigency that allows of its omission does or does not exist. And while the officer who should wilfully, negligently, or corruptly omit the duty would render himself amenable to the animadversion of the government, it would not affect the validity *48 of the contract unless the party had knowingly or corruptly participated in the officer’s default. But as a majority of the court are not entirely agreed upon these views, we place our decision upon different grounds. A majority hold that the act directing this work to be done, and making an appropriation for its execution, did not require an advertisement in the newspapers. We think that Secretary Usher, by virtue of the power conferred in that act, had power to make the contract with Fowler in the manner in which he did. We think that the law authorized the contract, although the appropriation was not quite adequate to its fulfilment. The act of 1820, as well as that of 1861, only forbids a contract to be made when there'is neither a law authorizing it nor an appropriation adequate to its fulfilment. Where there is either, the contract may be made. Here there was a law, in express terms, directing a certain work to be done, and in a certain manner, and according to the specified plans; and the appropriation made was to be expended under the direction of the Secretary of the Interior. The work was to be done. It was to be done under the direction of the Secretary of the Interior. There are no words of limitation or restriction, and he therefore could make a contract even beyond the amount of the appropriation.
This contract, if made in accordance with Jaw, was beyond the power of any Secretary to revoke or annul. There appears to have prevailed extensively a practice for one Secretary of a department to annul the contracts made by his predecessors. If made in accordance with law and without fraud, the contracts of this government with its citizens are no more subject to rescission by the United States than are ordinary engagements between man and man without the consent of both parties. Any other rule would work to the injury of the government itself, and be highly derogatory to - its character and credit; and in this we all concur.
We see nothing in this case to induce the belief that the transaction was otherwise than perfectly fair and honest. Before the contract was made proposals were invited from all the principal manufacturers of the particular ornamental iron-work of which the main library was composed, and with which the additions were to correspond. Proposals were received from a number, and, among the rest, from the parties to whom it was ■ eventually let by Secretary Harlan. The claimant’s bid was the lowest. He was well known to the Secretary and the architect. He had constructed the main library, He had furnished the material for the dome of the Capitol. He possessed every means and facility to do the work; and in all his previous dealings appeared to have given satisfaction to the officers and agents *49 of the United States under whom be had performed work, or to whom he had furnished materials.
From all these considerations we think he was wrongfully deprived of the fruits and benefits of his contract, although we have no doubt that the Secretary who acted in the matter did so from considerations of duty, believing that the contract had been illegally entered into. The ultimate expense to the United States, we believe, exceeded the price named in claimant’s contract. We regret that we are compelled to still add to that the damage the claimant has sustained.
The measure of that damage is the difference between what the work would have cost the claimant and the price he was to have received for its performance, deducting a reasonable sum for his time, trouble, risk, and the use of his capital for the time in which he would have been employed in its execution.
The best criterion of the cost of the work is what it actually cost the party who performed it. That, Mr. Cheney, the gentleman who superintended the performance of the work under the contract with the Architectural Iron Works, swears was $130,747. To which is to be added the sum of $9,000 received from old material out of the library, making the entire cost $139,747. But these old materials in the specifications, No. 29, would have belonged to the contractor, so that the exact cost of the work is the sum first stated.
As to the other matters which are to be deducted, we have been furnished with no evidence on either side to show their value or amount. Parties are so loth to accept our rule of damages in these cases, laid down by us -in numerous instances, that they leave us to guess on the subject. If they are injured by that, they must place it to account of their own omission. We do the best we can with the light they furnish.
The account will stand :
Contract price. $169,900 00
Deduct actual outlay.$130, 747 00
Time and superintendence. 5, 000 00
Bisk, insurance, interest, &e. 5, 000 00
- 140,747 00
29, 153 00
Deduct for materials on hand. 3,140 09
26, 012 91
The court therefore enter judgment for claimant for the sum of $26,012 91. ■