663 F.2d 419
 HEYL & PATTERSON INTERNATIONAL, INCORPORATED, Appellee,
v.
F. D. RICH HOUSING OF the VIRGIN ISLANDS, INCORPORATED and
F. D. Rich Housing Corporation, Appellants.
F. D. RICH HOUSING OF the VIRGIN ISLANDS, INCORPORATED, as
assignee of F. D. Rich Housing of Puerto Rico,
Incorporated, Appellant,
v.
GOVERNMENT OF the VIRGIN ISLANDS, Appellee.
 Nos. 80-2749, 81-1193.
 United States Court of Appeals,
Third Circuit.
 Argued July 14, 1981.
Decided Oct. 19, 1981.
 
 Lawrence Gochberg (argued), Gochberg & Berkman, Stamford, Conn., for appellants.
 Donald M. Bouton, Acting Atty. Gen., Edward A. Wascoe (argued), Asst. Atty. Gen., Dept. of Law, Charlotte Amalie, V. I., for appellee, Government of the Virgin Islands.
 Daniel M. Curtin, Pittsburgh, Pa. (argued), Geoffrey W. Barnard, Isherwood Barnard & Diehm, Christiansted, St. Croix, U. S. V. I., for appellee, Heyl & Patterson, Inc.
 Before SEITZ, Chief Judge, and HIGGINBOTHAM and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 With flare and kindled hope, on October 1, 1973, the Government of the Virgin Islands signed a contract with a developer to build up to 300 houses "for families of low and moderate income" at Estate Nazareth. The parties stressed that the "need for housing in St. Thomas, Virgin Islands" was so acute that it must be "constructed as expeditiously as possible." Now more than eight years later, instead of having at the site housing for the poor and those of moderate income, there has been built this extensive law suit, which some would call either a "lawyer's paradise" or a "litigation nightmare." After a gubernatorial election and resulting changes of government administrations, the parties now, instead of laying bricks for housing, are espousing subtle theories of contract, procedural, constitutional, and municipal law while placing the blame on the "other person" in this breach of contract action. There are claims now for hundreds of thousands of dollars because of purported breaches of contract by either the Government and/or the developer. During the eight year interim, not one house has been built pursuant to this contract, not one poor or moderate income person has benefitted by the Government's past expenditures, and in recent years the major project has been an intense legal skirmish in the district courthouse between the developer, the contractor and the Government. Because of the multi-faceted claims, charges and defenses, we are now obligated to sort out esoteric legal doctrines and probably to write with too much detail. Yet, in doing so, we probably thereby mask the tragic consequences which failures of this type cause the intended beneficiaries-families of low and moderate income, for in many ways the latter are the victims of what has been at best a fiasco.
 
 
 2
 This case involves an appeal from the consolidated trial of two breach of contract actions. In Heyl & Patterson International, Inc. v. F. D. Rich Housing of the Virgin Islands, Inc., and F. D. Rich Housing Corporation, Memorandum Opinion, No. 75-785 (D.V.I. May 23, 1980), (hereafter Heyl and Rich), the district court entered judgment in favor of appellee Heyl and against appellant Rich in the amount of $262,398.01, plus costs of $2,668.25, attorney's fees of $21,000.00 and prejudgment interest of $841.50, and dismissed all third party claims by appellant Rich against the Virgin Islands Government. In F. D. Rich Housing of the Virgin Islands, Inc. as Assignee of F. D. Rich Housing of Puerto Rico v. Government of the Virgin Islands, Memorandum Opinion, No. 76-62 (D.V.I. May 23, 1980), (hereafter Rich and The Government), the district court granted judgment in favor of appellee Government and dismissed all claims by appellant Rich against the Government.
 
 
 3
 Appellant's arguments are clearly not frivolous and appellant has sustained a significant economic loss. Nevertheless appellant has failed to tip the scales sufficiently in its favor to warrant reversal. With some disquietude we will affirm the district court's judgments in both cases.
 
 I.
 FACTS
 
 4
 On October 1, 1973, the Government of the Virgin Islands, in pursuit of its goal to provide much needed moderate income housing for the Virgin Islands, entered into a written agreement with appellant Rich for the development and construction of a moderate income housing project (hereafter the Agreement) under Title 29 of the Virgin Islands Code, Public Planning and Development.
 
 
 5
 The Agreement, executed by the Commissioner of Housing and Community Renewal (hereafter the Commissioner of Housing) and signed by the Governor of the Virgin Islands, Melvin H. Evans, called for the construction, in two phases, of 320 housing units at Estate Nazareth, St. Thomas, Virgin Islands. One hundred units were designated for immediate construction during Phase I. The 220 unit Phase II was scheduled to be under way within two years of the contract date. Each phase was scheduled for completion two years after the start of construction. The Government was to sell the land at Estate Nazareth to Rich for $7,000 per acre, including the cost of stipulated site improvements. Site improvements were specified as all work more than five feet from the exterior of constructed units, including but not limited to sewers, paved roads, parking areas, grading, walks, lighting, electrical service, drainage, and sewer systems.
 
 
 6
 The selling price of two-bedroom units was set at $22,050.00, three-bedroom units at $23,525.00 and four-bedroom units at $25,200.00. To secure its obligation to buy unsold units, the Government agreed to set up a $250,000.00 escrow fund for purchasing such units and making site improvements. The $92,400.00 which Rich agreed to pay for the land at Estate Nazareth also was to be deposited in this fund. An escrow fund, however, was never actually established by the Government.
 
 
 7
 Quit claim deeds for Estate Nazareth were delivered by the Government to Rich on August 21, 1974. Rich received a Notice to Proceed with Phase I from the Commissioner of Housing on August 22, 1974. Thereafter, on August 28, 1974 Rich engaged Heyl to act as general contractor for Phase I of the proposed development. The agreement between Heyl and Rich required Heyl to "substantially complete" all work within one year of receiving a Notice to Proceed from Rich. If Heyl failed to do so liquidated damages of $150.00 per day were to be paid by Heyl to Rich.
 
 
 8
 Rich's contractual obligation required it to pay Heyl monthly progress payments which were set at ninety per cent of the contract sums allocable monthly to labor and materials and equipment used and in storage. Payments were contingent upon Rich receiving certificates of payment from the project architect after he had approved Heyl's applications for payment. Heyl began billing Rich in November, 1974 and by April 30, 1975 had billed Rich for $270,848.31. No payments in fact were ever made by Rich to Heyl.
 
 
 9
 Several weeks after concluding its agreement with Rich, Heyl received Notice to Proceed as of September 20, 1974. Although Heyl assembled labor, equipment and materials to begin work on the project, construction could not proceed because the requisite building permit was not issued by the Government. The Virgin Islands Planning Office cited insufficient design information as its reason for rejecting efforts by Rich and subsequently Heyl to obtain the permit.
 
 
 10
 In December, 1974 Rich agreed to delay Heyl's "proceed date" until January 6, 1975, and received from the Government an indefinite extension of its own proceed date until a building permit was issued. Rich then notified Heyl that the Government's delay in processing the building permit was affecting its financial arrangements and causing a delay in its processing of contract payments. Despite approval of the housing development plan by the Virgin Islands Planning Office on January 2, 1975, and its recommendation that a building permit be issued, the permit remained unissued. Citing unresolved questions about Government funding for project improvements, the Commissioner of Public Works informed Heyl in a letter dated April, 1975 that no permit could be issued.
 
 
 11
 Meetings in April and August, 1975 between Rich and the Government, including then Governor Cyril King, who, in January, 1975, had succeeded Governor Evans in office, failed to move forward what until then, with the exception of $50,000.00 advanced by the Department of Housing to the Department of Public Works for preliminary road construction, was largely a "paper" project. Realization of the project became even more unsure when Governor King objected to certain design features of the units, the density of the project and a number of contract provisions which he thought unfairly burdened the Government. In September, 1975, the Government of Cyril King disavowed responsibility for "alleged 'unobserved' agreements consummated years prior to assuming office."[1] Shortly thereafter Heyl, having received no payments on its contract, brought suit against Rich in district court for breach of contract. Rich followed by asserting third party claims and a separate breach of contract action against the Government.
 
 II.
 RICH v. THE GOVERNMENT
 
 12
 Because it was Rich's 1973 agreement with the Government which precipitated both actions, we begin with Rich's claims against the Government rather than Heyl's breach of contract action against Rich.
 
 A. The Pleadings Maze
 
 13
 At the outset we are confronted with a strenuously pressed procedural objection that either the Government did not move to amend its answer to assert the defenses on which it ultimately won below, or that it was an abuse of discretion by the trial court to allow belatedly the challenged amendments. The pleading style and trial tactics of the Government were not a model of expedition and clarity, but apparently the trial judge grasped the issues and the appellant should have as well. Nevertheless we must trace the maze through which the pleadings flowed to reach the final judgment.
 
 
 14
 Heyl initiated a breach of contract action against Rich in December, 1975. Rich responded by asserting a third party claim against the Virgin Islands Government for indemnification for any liability it might have to Heyl and in a separate action sued the Government for breach of contract. In answer to appellant's claim the Government pleaded two affirmative defenses, neither of which alleged any illegality in the agreement between Rich and the Government. Three years later in January, 1979, the Government sought leave to amend its answer pursuant to Fed.R.Civ.P. 15(a), in order to assert a third affirmative defense alleging that the Agreement was void and unenforceable[2] and a fourth defense alleging its illegality. Rich agreed to withhold any objections to the Government's motion to amend if the court in granting leave to amend required the Government to clarify in detail the basis of its new defenses. The Government's response to Rich stated that the Agreement was illegal because it "involved the expenditure of substantial local revenues for which there was no appropriation and no authority by law," in violation of V.I.Code Ann. tit. 33 § 3101.
 
 
 15
 In his Memorandum and Order of March 6, 1979, the district court judge denied the Government's Motion for Summary Judgment, but granted it leave to amend its answer. The Government's clarification of its illegality defense was deemed by the court a satisfactory response to Rich's vagueness objection.
 
 
 16
 Although in its Pretrial Statement the Government alleged only that the Agreement was void and unenforceable "inasmuch as it was not authorized by law and an appropriation adequate to its fulfillment was never made," in its opening statement at trial it specified three additional illegality defenses: (1) failure of the project to comply with the requirement of Act No. 3088, V.I.Sess.Laws 1971 for an approved housing development plan; (2) failure of the project to meet the cost limitations set forth in V.I.Code Ann. tit. 29 § 191n; and (3) failure of the Department of Housing and Urban Renewal to make an authorized transfer of land to Rich.[3]
 
 
 17
 Appellant argues that the Government waived all illegality defenses except inadequate prior appropriations which was specifically pleaded in response to Rich's objections about the vagueness of the Government's illegality defense. Rich also argues that when the court permitted the Government to amend and then clarify its Fourth Affirmative Defense, no other illegality defenses could be pleaded and that absent a request for further leave to amend, the court improperly treated the Government's opening statement on defenses as amendments to the answer.
 
 B. The Standard for Amendment
 
 18
 Leave to amend pleadings out of time under Rule 15(a) of the Federal Rules of Civil Procedure is generally at the discretion of the trial court, Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), Zenith Radio Corporation v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 745, 802, 28 L.Ed.2d 77 (1971), and "(c)ourts have shown a strong liberality ... in allowing amendments under Rule 15(a)," 3 Moore's Federal Practice P 15.08(2) at 15-59 (2d ed. 1980), (footnote omitted), which specifically states that leave to amend "shall be freely given when justice so requires."
 
 
 19
 In Foman v. Davis the Supreme Court observed:
 
 
 20
 Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason-such an undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.
 
 
 21
 Id. 371 U.S. at 182, 83 S.Ct. at 230. Accord, U.S. v. Hougham, 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960); S. S. Silberblatt, Inc. v. East Harlem Pilot Block, 608 F.2d 28 (2d Cir. 1979); Skehan v. Trustees of Bloomsburg State College, 590 F.2d 470 (3d Cir. 1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979); Cornell and Company, Inc. v. Occupational Safety and Health Review Commission, 573 F.2d 820 (3d Cir. 1978); Thomas v. E. I. DuPont de Nemours & Co., 574 F.2d 1324 (5th Cir. 1978); Mertens v. Hummell, 587 F.2d 862 (7th Cir. 1978); Bireline v. Seagondollar, 567 F.2d 260 (4th Cir. 1977).
 
 
 22
 The trial court's discretion under Rule 15, however, must be tempered by considerations of prejudice to the non-moving party, for undue prejudice is "the touchstone for the denial of leave to amend." Cornell, 573 F.2d at 823. Accord, Foman 371 U.S. at 182, 83 S.Ct. at 230; Zenith Radio Corp., 401 U.S. at 330-31, 91 S.Ct. at 802; Skehan, 590 F.2d at 492. See also, 3 Moore's Federal Practice, P 15.08(4) at 15-85 to 91. In the absence of substantial or undue prejudice, denial must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment. Foman, 371 U.S. at 182, 83 S.Ct. at 230. See also, Goodman v. Mead Johnson & Co., 534 F.2d 566 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); Mertens v. Hummell, 587 F.2d 862 (7th Cir. 1978); Matlack, Inc. v. Hupp Corporation, 57 F.R.D. 151 (E.D.Pa.1973); 3 Moore's Federal Practice P 15.08(4) at 15-91 to 100. The decision of the trial court to grant or deny leave to amend is not subject to reversal except for abuse of discretion. Foman, 371 U.S. at 182, 83 S.Ct. at 230; Zenith Radio Corp. 401 U.S. at 330-31, 91 S.Ct. at 802; Cornell, 573 F.2d at 823; Canister Co. v. Leahy, 191 F.2d 255, 257 (3d Cir. 1951), cert. denied, 342 U.S. 893, 72 S.Ct. 201, 96 L.Ed. 669 (1951).
 
 
 23
 Although formal motion for leave to amend was never made after the trial had begun, the trial court's treatment of the Government's opening statement on their defenses as further amendments to the pleadings does not constitute reversible error.[4] The procedure for obtaining leave to amend pleadings set forth in Rule 8 of the Fed.R.Civ.P. should generally be heeded, but rigid adherence to formalities and technicalities must give way before the policies underlying Rule 15. "(T)he federal rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits," Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).
 
 
 24
 Appellant's abuse of discretion claim is grounded in its assertion that prior to trial the Government was granted a conditional leave to amend and thus waived the right to plead further defenses. We agree with the district court's conclusion, however, that in its Memorandum and Order of March 6, 1979 granting the Government leave to amend, there was no preclusion from further amendments.[5]
 
 
 25
 Appellant claims that there was no justification proffered for the delay in making the amendments and further that the pleadings were deliberately misleading. Appellant seems to suggest that such conduct constitutes reversible error because it is prejudice per se. However, appellant has a heavier burden than merely claiming prejudice, it must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the Government's amendments been timely. Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 n. 19 (3d Cir. 1969).
 
 
 26
 Though Rich argues that the opening statement of the Government constituted an unexpected change in theory which Rich, because of time restraints, was unable effectively to meet during trial, Rich failed either to seek a continuance to enable it to offer such rebuttal evidence or to present such evidence of prejudice in post-trial briefing. Even to this hour appellant has not indicated what evidence it would have presented in view of the Government's alleged change in theory. Furthermore, Rich could not have been entirely surprised by the Government's opening statement, because in the Government's Answer to Interrogatories Propounded by Plaintiff of September 29, 1976, the Government, through the Commissioner of Housing, stated that the contract between Rich and the Government was not binding for the reasons later given in the Government's opening statement at trial.
 
 
 27
 While the niceties of precise, timely and unambiguous pleadings are preferable, we must note that trial judges are somewhat like quarterbacks in that they have a broad range of options for their game plan, and the losing party is not entitled to a new trial even when the trial judge's ruling approaches the maximum latitude of the rules. Since the trial judge did not find that the Government's action rose to the level of deliberate deception or flagrant abuse and there was no prejudice proven, we do not believe on this record that the trial judge committed an abuse of discretion in allowing the amendments.
 
 C. The Validity of the Agreement
 
 28
 On a substantive level, several issues were raised challenging or supporting the validity of the October 1, 1973 agreement. In short, the Government claims the Agreement was invalid because: (1) the Agreement was not supported by adequate prior appropriations and thus violated V.I.Code Ann. tit. 33 § 3101; (2) a government-approved housing development plan, required by Act 3088, 1971 V.I.Sess.Laws, was not obtained; and (3) the agreement violated moderate income housing cost limitations established by V.I.Code Ann. tit. 29 § 191n.
 
 
 29
 Appellant claims that the Agreement was valid and enforceable because: (1) there was no appropriations gap, and even if there were, it did not render the Agreement void ab initio; (2) the Agreement was "authorized by law" and thus enforceable under both V.I.Code Ann. tit. 33 § 3101 and V.I.Code Ann. tit. 31 § 248; (3) legislative approval of a housing development plan was not required for this Agreement and (4) moderate income housing cost limitations established by V.I.Code Ann. tit. 29 § 191n are inapplicable to the development at Estate Nazareth.
 
 1. The Appropriations Gap
 
 30
 Anyone who manages a budget recognizes the possible nightmare when expenditures significantly exceed income. Such problems could be particularly disastrous if governmental officials could obligate their government when the legislature had not appropriated the prerequisite funds. To prevent such calamities, at least since 1870 there has been a federal statute which makes it unlawful "for any department of the (federal) government to spend in any one fiscal year any sum in excess of appropriations made by Congress for that fiscal year, or to involve the government in any contract for the future payment of money in excess of such appropriations." 16 Stat. 251 (July 12, 1870). Since 1870 the original federal statute has had several modifications but, with few exceptions, officers or employees of the United States have been prohibited from making expenditures or contract obligations in excess of appropriated funds. In 1957, the Legislature of the Virgin Islands adopted verbatim the federal statute as embodied in 31 U.S.C. § 665. See V.I.Code Ann. tit. 33 § 3101. In reliance on this statute the Government raised its first illegality defense-that in substance the agreement of 1973 was a nullity because it attempted to commit the Government of the Virgin Islands to financial obligations in excess of any funds appropriated.
 
 
 31
 Despite all of the fanfare of initiating a project to build housing for the poor and those of moderate income, despite the expenditure of at least $50,000 in government appropriations, despite the authorization of $950,000 for this project, despite the fact that preliminary road construction was started, despite the fact that there was testimony that in excess of $500,000 had already been expended on the project, Rich lost its entire case on the basis of a mathematical calculation that there was a $150,000 shortfall in the total appropriations. According to the trial judge $1.1 million was necessary for the site work required under the contract[6] and by his calculation only $950,000[7] was appropriated. Thus the major issue for our review is whether, as of October 1973, the Legislature had appropriated sufficient funds for the cost of these site improvements or whether there was a shortfall of such a magnitude to make the original agreement null and void ab initio.
 
 
 32
 The relevant statutes on adequacy of appropriations provide:
 
 
 33
 Expenditures or contracts in excess of appropriations.
 
 
 34
 No officer or employee of the Virgin Islands shall make or authorize an expenditure from, or create or authorize an obligation under, any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the government in any contract or obligation for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.
 
 
 35
 V.I.Code Ann. tit. 33 § 3101.
 
 
 36
 Unauthorized purchases.
 
 
 37
 No contract or purchase on behalf of the government shall be made unless the same is authorized by law or is under an appropriation adequate to its fulfillment.
 
 
 38
 V.I.Code Ann. tit. 31 § 248.
 
 
 39
 Violations; recovery of funds.
 
 
 40
 (a) Any purchase order or contract executed in violation of this chapter and of the rules and regulations promulgated for its enforcement, shall be null and ineffective and, if public funds have been expended in relation therewith, the amount so expended may be recovered in behalf of the Government of the Virgin Islands through proper action instituted for such purpose.
 
 
 41
 V.I.Code Ann. tit. 31 § 249.
 
 
 42
 Our reading of V.I.Code Ann. tit. 33 § 3101 and V.I.Code Ann. tit. 31 §§ 248 and 249 and the limited number of cases dealing therewith leads us to affirm the district court's conclusion that inadequate prior appropriations made Rich's agreement with the Government void and unenforceable. We do so after careful consideration of the disjunctive language of both § 248 and § 3101. Although aware of the equitable claims on both sides, we believe the trial court's finding of an appropriations gap of $150,000 is supported by the record. The meaning of this "gap," however, must be considered more closely.
 
 
 43
 In Sargeant v. Government of the Virgin Islands, 10 V.I. 245 (D.V.I.1973) authored by the trial judge in this case, Chief Judge Christian, a contract executed without adequate prior legislative appropriations in violation of V.I.Code Ann. tit. 31 § 248 and V.I.Code Ann. tit. 33 § 3101 was held void and unenforceable under V.I.Code Ann. tit. 31 § 249. Although three legislative resolutions had been passed authorizing and approving the building project at issue in Sargeant, they were held not sufficient to overcome the statutory command of §§ 248 and 3101 that no contracts be executed except in conformity with legislative appropriation of funds. Because no formal legislative appropriation had been made, plaintiff was limited to those funds advanced by the federal government for architectural fees. So far as local funds were concerned, plaintiff was denied recovery.
 
 
 44
 Appellant's position, however, is distinguishable from that of plaintiff in Sargeant. Plaintiff's contract in Sargeant was supported by legislative resolutions only, which the court held were not equivalent to formal legislative appropriations. Sargeant, 10 V.I. at 248. Here formal legislative appropriations totaling $950,000 were made in support of Rich's agreement with the Government. But because appropriations were inadequate Rich had the burden of showing that its Agreement was authorized by law in compliance with the alternative mandate of §§ 248 and 3101 that absent conformity with legislative appropriations, a contract with the Government must be authorized by law to be valid. See generally, Sargeant, 10 V.I. 245.
 
 
 45
 2. "Authorized By Law"
 
 
 46
 We agree with appellant's contention that both the Commissioner of Housing and the Governor had express authority to enter into a contract with Rich under V.I.Code Ann. tit. 29 § 191d(a)(6).[8] The Governor is similarly authorized by V.I.Code Ann. tit. 29 § 192, ("Acceleration and expansion of housing and homestead programs,"), "to make and execute contracts and other instruments necessary or convenient to the exercise of the powers conferred by this section," V.I.Code Ann. tit. 29 § 192(b)(7), which includes authority to: study and determine the housing needs of the Virgin Islands, V.I.Code Ann. tit. 29 § 192(b)(1); carry out programs and projects in accordance with such determinations, V.I.Code Ann. tit. 29 § 192(b)(2); and arrange or contract for "services, privileges, works, utilities or facilities" required by an authorized home construction project. V.I.Code Ann. tit. 29 § 192(b)(3).
 
 
 47
 But a finding that both officials were expressly authorized to make the contract does not mean the Agreement was "authorized by law" under §§ 248 and 3101. To meet this standard, the Agreement must have been executed not only "in accordance with procedures set forth by law," V.I. Code Ann. tit. 29 § 191d(a)(6), but also must be in accordance with other statutory requirements. We affirm the district court's finding that the Agreement was "unauthorized by law" because it failed to comply with the housing development plan requirement of Act 3088, 1971 V.I. Sess. Laws and the cost limitations of V.I. Code Ann. tit. 29 § 191n.
 
 3. The Housing Development Plan Requirement
 
 48
 As an alternative basis for his holding that the 1973 agreement was invalid, the trial court concluded that Rich's agreement with the Government also failed to comply with Act 3088, 1971 V.I. Sess. Laws at 313-14.[9] For our purpose the key issue on review as to this statute, is what is the meaning of the terms "prior" and "government sponsored" housing projects. The literal language of the statute requires that government-sponsored housing projects receive the approval of both the governor and the Legislature by their adoption of a "housing development plan" if the project is constructed under the jurisdiction of the Department of Housing and Community Renewal or the Virgin Islands Housing Authority. Rich does not contend that they had received any legislative approval or adoption of the housing plan when they executed the 1973 agreement. Instead, Rich asserts that the statute was not applicable to the Estate Nazareth development because it was not a "government sponsored housing project."
 
 
 49
 We disagree and adopt the well-reasoned findings of the district court. As the court noted, "Government-Sponsored Housing," absent legislative intent showing otherwise, surely means not just housing actually built by the Government. The Government's extensive involvement in the building of Estate Nazareth belies any contention that the development was purely a private endeavor. Aside from its responsibility for making site improvements, the Government was obligated under the Agreement to designate purchasers for each unit, arrange mortgage financing for purchasers, and purchase all unsold units. Furthermore the Government was to seek federal funding from the Department of Housing and Urban Development and assist Rich in obtaining construction financing. We believe that involvement of the Government on this level brought the Nazareth development under the jurisdiction of the Department of Housing and Community Renewal.
 
 
 50
 Appellant urges us to hold that the provisions of Act 3088, requiring legislative adoption and approval, do not apply as a condition precedent to the execution of the contract. Rather appellant asserts that this provision becomes operative only when the actual construction of the housing units is about to take place. We must note that neither the position of the appellant nor the appellee is frivolous, but here we are required to construe an important statute without any revelation of its legislative history; thus, in this context the comments of our colleague, Judge Garth, are particularly relevant:
 
 
 51
 When defining specific terms in a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute ... and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature.
 
 
 52
 Marsh v. Government of the Virgin Islands, 431 F.Supp. 800, 804 (D.V.I.1977) (Garth, Circuit Judge, sitting by designation).
 
 
 53
 We suspect that the Virgin Islands Legislature did not intend for Act 3088 to have the limited impact asserted by appellant; we therefore agree with the district court's rejection of such a rigid interpretation. To decide as Rich contends, the seeming "objects and policy of the law" would be repudiated. For under Rich's rationale, contracts executed prior to the approval of a housing development plan would nevertheless obligate the Government to go forward with that housing development even if it did not fulfill the goals and purposes of the Government to provide quality moderate income housing.
 
 4. Statutory Cost Limitations
 
 54
 As another alternative ground the trial judge held that the Agreement was "illegal and unenforceable" because it exceeded the $25,000 cost limitations of V.I. Code Ann. tit. 29 § 191n. V.I. Code Ann. tit. 29 § 191n states:
 
 Cost Limitations
 
 55
 (a) No dwelling shall be erected by the Government at a cost of more than $25,000 exclusive of the proportional cost of the land.
 
 
 56
 (b) The minimum selling price for a dwelling shall be a sum at least equal to the Government's acquisition cost plus the cost of any additions and improvements.
 
 
 57
 Rich would have us interpret § 191n to include only housing actually built by the Government and not that built by a private developer for the Government. We decline to do so and find that the trial court did not err in concluding that "erected by the Government" is to be broadly interpreted to embrace housing built by private developers in circumstances such as those presented by this case, especially since the Agreement itself states that Rich's contract with the Government "relates to a Moderate Income Housing Project as defined in Title 29."[10] The Legislature set $25,000 as the maximum selling price apparently because it believed that price would assure that moderately priced housing was built. To except out housing built for the Government by private developers would undermine the intent and purposes of the moderate income housing program.[11]
 
 
 58
 Appellant's reliance on cases interpreting the Capehart Act, 69 Stat. 635, ch. 783, §§ 101-104, 109(b), 111, 401-409 (1955) (codified at 12 U.S.C. §§ 1748-1748g and 42 U.S.C. §§ 1594-1594f),[12] is misplaced. In Anthony P. Miller, Inc. v. United States, 348 F.2d 475, 172 Ct.Cl. 60 (1965) the Government contractor was permitted to recover additional compensation for costs incurred in repairing housing units damaged as a result of defective Government plans even though this increased the costs above the mortgage limit set under the Act. He was not permitted to recover for extra work not called for in the contract which would have pushed costs beyond the mortgage limit. Rich's position is clearly distinguishable from that of the contractor in Anthony P. Miller. The cost overruns in the latter case were not negotiated into the contractor's initial agreement with the Government in violation of the statutory ceiling. The illegal cost overrun in the case of appellant, however, was inherent in appellant's contract.
 
 
 59
 The trial court concludes that under § 191n(a) only the proportional cost of land can be deducted from the cost of each dwelling. We find no authority for the Commissioner of Housing to ignore the costs of the improvements by including them in the cost of land. In Centex Construction Corp. v. United States, 162 Ct.Cl. 211 (1963), another Capehart Act case relied upon by appellant, the Secretary of Defense had express authority to use his discretion to determine whether to allocate the cost of utilities and improvements to housing contract mortgages or to appropriated funds. He did not have authority to ignore those costs, exceed the $16,500 mortgage limit set by the Act or pay costs greater than appropriated funds. The $7,000 per acre which Rich paid for the land, testimony showed, was the cost of the land to the Government, absent consideration of site improvement costs. If we were to accept appellant's reasoning, the Government would be left to absorb the total cost of site improvements, which in this case would exceed $1 million. For the same reason we conclude that the trial court correctly determined that Rich's agreement violated § 191n(b): the minimum selling price of $22,050.00 set by the Agreement, because it did not include the Government's $11,000 costs for site improvements, was illegal.
 
 D. Appellant's Right of Recovery
 
 60
 Appellant argues that neither inadequate prior appropriations, nor the lack of a Government-approved housing plan, nor the failure of the Agreement to conform to statutory cost limitations should defeat Rich's right to payment to the extent of appropriated funds. We conclude, however, that because the Agreement did not meet statutory requirements it was null and void ab initio and under the proscription of § 249 cannot be enforced on a theory of quantum meruit, substantial compliance or estoppel. Government of the Virgin Islands v. Ottley, Nos. 3-1970, 285-1970, and 58-1970 (D.V.I. March 7, 1972); Sargeant, 10 V.I. at 252-53.
 
 
 61
 In Government v. Ottley contractors were barred under Section 249 from asserting a defense of estoppel or quantum meruit when the Government sought recovery of funds expended in violation of statutory bidding procedures. Relying on Ottley, the district court in Sargeant, denied recovery, in so far as local funds were concerned, on a theory of quantum meruit or estoppel when the Government contract was executed in violation of V.I. Code Ann. tit. 33 § 3101. The reasoning of the court in both cases bears repeating: If contracts violative of statutory prohibitions may be executed by government agencies and subsequently enforced, the power of the legislature and the processes of government itself would be undermined. See Sargeant, 10 V.I. at 252, citing Government of the Virgin Islands v. Ottley, Mem. op. at 3.
 
 
 62
 Appellant cites numerous cases in support of its proposition that recovery should be permitted at least to the extent of appropriations.[13] But none of the cases relied upon by appellant involved recovery on a contract not made in accordance with law. Recovery was permitted for cost overruns or in spite of inadequate governmental appropriations, but not in the face of an invalid contract. The invalidity of appellant's Agreement bars recovery on any basis.
 
 
 63
 It is the general rule that where a bargain is either partially or wholly illegal, not even a quasi-contractual recovery can be had. (footnote omitted.)
 
 
 64
 This rule is strictly enforced against those entering into bargains with public bodies where the mode of contracting is limited and defined by constitution, statute, ordinance, or appropriate administrative regulation. (footnote omitted.)
 
 
 65
 Where such restriction or limitation is not observed, the law will not raise a constructive contractual obligation although the public body has received the entire performance, since so to do would nullify in effect the restriction or limitation.
 
 
 66
 Nor can an agreement with a municipality, absolutely void for non-conformity with statutory requirements, be made enforceable by ratification or estoppel. (footnote omitted.)
 
 
 67
 15 Williston on Contracts § 1786A at 345-46 (3d ed. 1972).
 
 
 68
 The illegality of appellant's agreement with the Government cannot be overcome by protestations against the Government's alleged bad faith or unfair dealing. This court's comments in In re Hooper's Estate, 359 F.2d 569 (3d Cir. 1966), a case in which the Virgin Islands Government was permitted to recover from deceased's estate over $1 million in subsidies erroneously granted deceased by the Tax Exemption Board and the Governor, apply equally to this case.
 
 
 69
 " * * * Whatever the form in which the Government functions anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority, (and the law.)" * * * The oft-quoted observation in Rock Island, A. & L. R. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, 189, that 'Men must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury.
 
 
 70
 " * * * The circumstances of this case tempt one to read the regulation(s), since it is for us to read (them) with charitable laxity. But not even the temptations of a hard case can elude the clear meaning of the regulation(s)."
 
 
 71
 Id. at 578, (citations omitted) (emphasis added) quoting Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384-86 (1947).
 
 III. HEYL V. RICH
 
 72
 As previously noted, Rich had a two-prong theory to its litigation strategy. The first, which we have just discussed, was that the Virgin Islands Government breached its contract and therefore Rich was entitled to compensatory damages. Its alternative theory was its defense in the case of Heyl v. Rich, wherein Heyl sought damages from Rich. As to the latter, Rich in substance argues that as per its contract with Heyl and standard contract doctrine, Heyl must bear whatever losses it suffered as a result of the debacle on Estate Nazareth. The trial judge rejected Rich's contentions.
 
 A. Allocation of Risk
 
 73
 The trial court concluded that the underlying risk of economic loss for the failure of Rich's contract with the Government fell on Rich and that Heyl had a compensable reliance interest which was not waived by the parties' agreement.
 
 
 74
 Appellant argues, however, that two aspects of its contract with Heyl specifically indicate that Heyl bore the risk of failure of Rich's agreement with the Government: (1) Heyl's duty under Paragraph 1a.46.1 of the Project Specifications to obtain a building permit for the proposed project, and (2) the waiver provision of Article 8 of the Heyl-Rich Agreement.
 
 
 75
 Neither Heyl nor Rich challenges the trial court's determination that Paragraph 1a.46.1 of the Specifications[14] assigned Heyl the duty to obtain a building permit. Rich would have us infer from this, however, that both parties intended for progress payments to be contingent upon Heyl obtaining a building permit. We are unable to discern in either the language of Paragraph 1a.46.1 or Article 6,[15] or the subsequent behavior of the parties the intent which appellant would have us find. We find the trial court's finding on this issue was not clearly erroneous.
 
 
 76
 A more difficult issue is appellant's assertion that Article 8 of its contract with Heyl constitutes a waiver of Heyl's right to sue Rich for breach of contract. Article 8 reads in part:
 
 
 77
 The Contractor is aware that the work of this contract is being done pursuant to an agreement between the Owner and Government of the Virgin Islands and that the Contractor has read said contract and understands the provisions contained therein. In the event either the Owner or the Government of the Virgin Islands shall fail to comply with one or more provisions of said agreement between them, Contractor agrees it shall make no claim against the Contractor (sic) for damages or extra payment allegedly arising from said failure to comply; unless such action directly affects the dwelling unit costs.
 
 
 78
 (emphasis added). Rich argues that the second "Contractor" in the last sentence was meant to read "Owner," while Heyl contends that the intended words were "Government of the Virgin Islands." We believe the trial court was correct in concluding that the disputed word was intended to read the "Government of the Virgin Islands," as asserted by Heyl, and that Heyl had not waived its right to sue Rich for breach of contract.
 
 
 79
 Finally, relying upon Restatement (Second) of Contracts §§ 294 and 296 (Tent. Draft No. 10, 1975)[16] the trial court determined that Heyl had a compensable reliance interest because Rich bore the risk of the parties' mutual mistake insofar as the legality of Rich's agreement with the Government. Rich objects to the reasonableness of the trial court's allocation of the risk of mistake as provided for under § 296(c), but under the circumstances of this case, it clearly was not erroneous for the court to so allocate the risk of mistake as it did and subsequently conclude that Heyl had a compensable reliance interest under Restatement (Second) of Contracts § 300, Comment b (Tent. Draft No. 14, 1979), which provides that "a party may also have a claim that goes beyond mere restitution and includes elements of reliance by the claimant."
 
 B. The Damage Issue
 
 80
 The question of damages was extensively considered by the trial court, which determined that Heyl's reliance interest entitled Heyl to damages of $262,398.01 plus costs of $2,668.25, attorney's fees of $21,000.00 and prejudgment interest of $841.50. Rich takes issue with the trial court's findings only as to the award of damages for steel which did not conform to contract specifications. Although the contract called for grade 50 steel, Heyl substituted grade 40. On the basis of testimony offered by witnesses for Heyl the trial court concluded that the lower grade steel could and would have been partially utilized on the project. Accordingly Heyl was reimbursed for 50% of the cost of the steel or $33,828.53. Although witnesses for Rich testified that grade 40 steel was not an interchangeable substitute for grade 50 and that substitution would not only be difficult, but also involve extensive design revisions, we cannot conclude from the evidence of record that the district court's finding was clearly erroneous. Consequently we will let stand the $33,828.53 damage award for the steel.IV.
 
 A PYRRHIC VICTORY
 
 81
 As we stated in the beginning of this opinion, one has to have some disquietude with the results of this decision. There is nothing which this court can do to reassemble the housing project that, like Humpty Dumpty, has been irretrievably shattered, and we are left with choosing among several undesirable alternatives. Families of low and moderate income still don't have housing at Estate Nazareth. The Government has spent substantial sums on this now decimated project; Rich claims that it spent "more than a half million dollars on the Nazareth project in reliance on the Government's own (earlier) recommendation of the townhouse concept." (Appellant's brief at 24). Rich has been subjected to an additional loss by a very substantial judgment below for a project that was aborted in its infancy because of changes in governmental administration. Although the Government has prevailed on appeal because of a plethora of valid technical objections, it seems that the primary reason why the project floundered was not the failures to comply fully with the statutory mandates, but probably because a succeeding governor was not committed to implementing the detailed plan of his predecessor. With the Government's repudiation of its predecessor's work, those who are poor and of moderate income did not get even one of the three hundred houses planned. Much of the Government's money was spent, and a private developer has sustained an extraordinary loss. Using blunt language the appellant asserts that:
 
 
 82
 The district court's opinion, if left undisturbed, will undermine the confidence of all those who contemplate entering into solemn contractual obligations with the Government of the Virgin Islands. Moreover, those who have contracts with the Government are now left in grave doubt as to the enforceability of their agreements.[17] Appellant's brief at 25.
 
 
 83
 Though on this record the Government has prevailed, in the long run, if future developments are to be built, this case may be merely a pyrrhic victory for the Government because the winning of this law suit is not the equivalent of meeting the desparate housing needs of the families of poor and moderate income in the Virgin Islands.
 
 V.
 CONCLUSION
 
 84
 For the reasons noted in Parts I, II, and III, the judgments appealed from in both cases will be affirmed.
 
 
 
 [1]
 Letter of September 2, 1975 from Peter deZela, Executive Assistant to Governor, to Irvin J. Silver, Vice-President, F. D. Rich Housing Corporation. The concluding paragraph of Mr. deZela's letter stated in full that:
 In closing, I would like to re-emphasize that this new Administration should not be held fully responsible for alleged "unobserved" agreements consummated years prior to assuming office, that the present financial position of the government may now present an insuperable obstacle in resolving the various problems attending the proposed housing project, and that F. D. Rich itself appears to have failed to observe a number of provisions of the 1973 contract.
 
 
 [2]
 The Government's third affirmative defense alleging that the Agreement was unenforceable because the contract was illusory and lacked mutuality is not at issue in this appeal. The district court found the Agreement was not void and unenforceable for lack of consideration. Mem. op. at 3
 
 
 [3]
 The district court's finding that an authorized transfer of land to Rich had taken place is unchallenged and not at issue in this appeal
 
 
 [4]
 Cf., Sherman v. Hallbauer, 455 F.2d 1236 (5th Cir. 1972) in which the appellate court in reversing the trial court's grant of summary judgment stated that plaintiff's motion in opposition to summary judgment should have been construed as a motion to amend the pleadings. The substance of plaintiff's motion represented a change in legal theory which provided, the court said, sound support for plaintiff's case and militated against summary judgment
 
 
 [5]
 The court's Memorandum and Order addressed both the Government's Motion for Leave to Amend its answer and its Motion for Summary Judgment, but it is the former which concerns us here. The court's comments on the amendments follow:
 The Government seeks to amend its complaint by adding an admission, to which no party objects, and by inserting third and fourth affirmative defenses. F. D. Rich has no objection to the amendments other than a concern that the defenses are stated in a vague manner. In the Government's Memorandum in support of Motion for Summary Judgment and its Reply to F. D. Rich's Response for Leave to Amend Answer, the vagueness noted by F. D. Rich has been cured. Although not directly affected by the amendments, Heyl also objects to them on the basis that they are likely to delay the upcoming trial. Heyl's fear is misplaced, however, since the amendments address solely legal issues and require minimal additional trial preparation. Thus, there is no reason for disallowing the Government's request for leave to amend.
 Mem. and Order of March 6, 1979 at 2.
 
 
 [6]
 Rich objects to this figure only insofar as it includes site improvements for the entire 320-unit Nazareth project. Rich argues that since only 100 units were scheduled to be built in Phase I, the $1.1 million figure should be reduced proportionately. Although there is an equitable appeal to appellant's assertion, it is not sufficiently meritorious to counter the fact that upon signing the Agreement on October 1, 1973, the Government became obligated to make site improvements for the entire project. This was not obviated by the fact that the project was to be done in a minimum of two phases. Furthermore, appellant's claim was not supported by evidence of an alternative estimate of the Government's site cost obligation. Consequently, we cannot find that the trial court's $1.1 million estimate of the Government's liability was clearly erroneous
 
 
 [7]
 Seven hundred fifty thousand dollars ($750,000) was appropriated by the Legislature in 1971 for "the construction of roads and site improvements, Estate Nazareth, including recreational facilities," with the specific proviso that the funds "remain available until expended for the projects and purposes hereinafter expressly named." 1971 V.I.Sess.Laws Act No. 3054. The district court correctly concluded that because of the Act's proviso language, the $750,000 could be expended beyond its year of appropriation under V.I.Code Ann. tit. 33 § 3111 which states that an appropriation does not automatically expire at the end of the fiscal year if otherwise provided by law. On July 2, 1973, $200,000 in additional funding was appropriated. 1973 V.I.Sess.Laws Act 3445. Thus a total of $950,000 was specifically appropriated by the Legislature for the Nazareth development
 
 
 [8]
 The relevant provisions of V.I.Code Ann. tit. 29 provide:
 § 191d. Powers and duties of the Commissioner.
 (a) In addition to any other powers conferred upon him by this subchapter or any other provisions of law, the Commissioner, with the approval of the Governor, and on behalf of the Government of the Virgin Islands, may:
 (6) enter into contracts in accordance with procedures set forth by law, and formalize and execute all instruments necessary or advisable in the exercise of the powers granted to him or the Government in carrying out the purposes of this subchapter;
 (emphasis added).
 
 
 [9]
 Act 3088, 1971 V.I. Sess. Laws at 313-14 states:
 To Require the Adoption of a Comprehensive Housing Development Plan Prior to the Construction of Government-Sponsored Housing Projects and for other purposes
 Be it enacted by the Legislature of the Virgin Islands:
 SECTION 1. Notwithstanding any other general or specific law to the contrary, no housing project, housing development or housing unit shall be constructed under the jurisdiction of the Department of Housing and Community Renewal or the Virgin Islands Housing Authority unless a "housing development plan" therefor is first adopted and submitted to the Governor and the Legislature for approval. The housing development plan required by this Act shall be a statement by words, maps, graphics and other appropriate forms of the overall proposed housing project.
 
 
 [10]
 In 1974 the applicability of § 191n to Rich's agreement with the Government was considered. Responding to the Commissioner of Housing's inquiry about passing increased costs on to prospective homeowners, the Attorney General of the Virgin Islands stated that under V.I. Code Ann. tit. 29 § 191n(b) prospective homeowners would be required to absorb the difference between their stated contract price and the Government's costs. Appellant's contract with the Government contained an escalator clause based on the cost of living index, but no comparable clause appeared in the contracts of prospective homeowners. Because Section 6 of homeowners' contracts expressly incorporated by reference Title 29, however, the Attorney General concluded that 191n(b) governed. 7 V.I.Op.A.G. 332 (1974)
 
 
 [11]
 See V.I. Code Ann. tit. 29 § 191(a)(1)-(6), § 191(b)
 
 
 [12]
 The purpose of the Capehart Act, which had its inception in Title IV of the Housing Amendments of 1955, 69 Stat. 646, was to provide adequate and inexpensive military housing near military installations. The Secretary of Defense was authorized to enter into contracts for such housing with eligible contractors and given broad authority with respect to funds appropriated under the Act. Federal mortgage insurance was made available for financing, but a mortgage ceiling of $16,500 was set, limiting the cost per unit to that amount
 
 
 [13]
 See e. g., Reeder v. United States, 1 Ct.Cl. 141 (1844) (recovery on a claim for compensation permitted where Secretary of Navy authorized to appoint three persons to do required work even though the $6,000 appropriation was exceeded); Fowler v. United States, 3 Ct.Cl. 43, 48 (1867) (recovery permitted on a contract for enlargement of Library of Congress even though the contract exceeded the appropriated amount where an Act of Congress specifically authorized the enlargement); Sutton v. United States, 256 U.S. 575, 581, 41 S.Ct. 563, 565, 65 L.Ed. 1009 (1921) (recovery of contract price for improvement of navigable channel permitted, but no recovery allowed for work done in excess of appropriation)
 
 
 [14]
 Paragraph 1a.46.1 states that:
 The Sub-Contractor shall obtain at his own expense all required permits for the proceeding of his work.
 
 
 [15]
 Article 6 states as follows:
 PROGRESS PAYMENTS
 Based upon applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided in the Conditions of the Contract as follows:
 On or about the 25th day of each month 90% per cent of the proportion of the Contract Sum properly allocable to labor, materials and equipment incorporated in the Work and 90% per cent of the portion of the Contract Sum properly allocable to materials and equipment suitably stored at the site or at some other location agreed upon in writing by the parties, up to the 25th day of that month, less the aggregate of previous payments in each case; and upon Substantial Completion of the entire Work, a sum sufficient to increase the total payments to 90% per cent of the Contract Sum, less such retainages as the Architect shall determine for all incomplete Work and unsettled claims.
 
 
 [16]
 Restatement (Second) of Contracts §§ 294 and 296 (Tent. Draft No. 10, 1975) read as follows:
 § 294. WHEN MISTAKE OF BOTH PARTIES MAKES A CONTRACT VOIDABLE.
 (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 296.
 (2) In determining the effect of the mistake on the agreed exchange of performances, account is taken of any relief available by way of reformation, restitution, or otherwise.
 § 296. WHEN A PARTY BEARS THE RISK OF A MISTAKE.
 A party bears the risk of a mistake when
 (a) it is allocated to him by agreement of the parties, or
 (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates, but treats his limited knowledge as sufficient, or
 (c) it is allocated to him by a term supplied by the court on the ground that it is reasonable in the circumstances to do so.
 (emphasis added).
 
 
 [17]
 Appellant further asserts in its brief:
 After the Evans Administration, with whom the contract had been concluded, was defeated in the November 1974 election, the new Administration of Governor King simply repudiated the deal. Edmund Strack, Rich's then vice-president in charge of the Caribbean, testified as follows in regard to a meeting with the new Governor in April 1975:
 (I)t was a very discouraging meeting, since little to nothing happened. The Governor seemed to be wrapped up in his own thoughts and we exchanged comments. The meeting lasted less than an hour. And he advised everybody to get together and come back in ten days. It never happened.
 Q. Well, did he say anything about the Nazareth (project?)-
 A. He said his commissioner had been saying prior to the committee he did not like the concept that we had. He wanted single houses with lower density, and he just didn't like the concept of our project, and he didn't want to get stuck with what another administration had (set) up.
 Q. He what?
 A. He didn't want to do something which he felt was wrong that another administration had started.
 (App. at 229a-230a) (emphasis added). Mr. Strack's testimony was supported and amplified by Irwin Silver, Rich's Vice-president in charge of sales and development, who was also present at the meeting:
 To the best of my recollection, the governor first of all took exception to the plan we were trying to execute.
 * * * And he indicated a desire for single family homes. He indicated that he felt the lower density would be more to his liking. He indicated that he did not like the provision, didn't agree with the provision that would require the Virgin Islands to guarantee the sale of the units.
 * * * And he also did not like the requirement of having to develop the site.
 Q. To do the site work?
 A. That's correct.
 Q. Did you have any reaction to this?
 A. I was stunned. I indicated to the governor at this point in time he was changing our agreement, and this couldn't possibly happen.
 (App. at 235a-237a)
 The final repudiation was contained in a letter dated September 2, 1975 from the Executive Assistant to the Governor. Mr. Peter de Zela, who pointed out that the Governor did not approve of the housing plan, wanted a lower density and objected to provisions of the contract which were claimed to be "disadvantageous" to the Government. (App. at 368a, R-26). The letter concluded (Appellants' brief at 8):
 In closing, I would like to re-emphasize that this new Administration should not be held fully responsible for alleged "unobserved" agreements consummated years prior to assuming office, that the present financial position of the Government may now present an insuperable obstacle in resolving the various problems attending the proposed housing project, and that F. D. Rich itself appears to have failed to observe a number of provisions of the 1973 contract. (App. 369a).
 This repudiation came despite the warning from Rich that it and its contractor had expended "in excess of $500,000" in reliance on the contract. (App. at 363a, Exh. R-22). (Appellant's brief at 8, 23-24)