**UNITED STATES of America, Plaintiff,**

v.

**KEYSTONE SANITATION COMPANY, INC.; Kenneth F. Noel, individually and f/d/b/a Keystone Sanitation Company; Anna M. Noel, individually and f/d/b/a Keystone Sanitation Company; Quebecor Printing Fairfield, Inc.; C & J Clark, America, Inc.; The Esab Group, Inc.; the Genlyte Group, Inc.; Hanover Bronze and Aluminum Foundry, Inc.; Kemper Industries, Inc.; R.H. Sheppard Company, Inc.; and SKF USA, Inc., Defendants**

v.

**ADVANCED DISPOSAL SERVICE, et al., Third-party Defendants**

Civ. A. No. 1:CV–93–1482.

United States District Court, M.D. Pennsylvania.

Aug. 14, 1995.

Robert Long, Jr., Asst. U.S. Atty., Harrisburg, PA, Bernice I. Corman, Daniel Dertke, U.S. Dept. of Justice, Environmental & Natural Resources Division, Washington, DC, for U.S.

Thomas Scott, Killian & Gephart, Harrisburg, PA, for 8 Generator Defendants.

Gregory Barton Abeln, Carlisle, PA, for Third–Party Plaintiffs.

Charles E. Gutshall, Susan Schwab, Rhoads & Sinon, Harrisburg, PA, Liaison for all Third–Party Defendants.

Robert Fox, Manko, Gold & Katcher, Bala Cynwyd, PA, Liaison Counsel for Waste Management.

Robert Hoffman, Reed, Smith, Shaw & McClay, Harrisburg, PA, for Keystone & Noel Defendants.

## MEMORANDUM

RAMBO, Chief Judge.

### I. *Introduction*

In this action initiated by the United States of America under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a), as amended by the Superfund Amendments and Reauthorization Act (SARA), (hereinafter CERCLA, § 107(a)), the original Defendants grouped as "Generator Defendants" have moved for a preliminary injunction. The Generator Defendants seek to prevent and/or halt the dissipation of assets now or formerly belonging to original Defendants Keystone Sanitation Company ("Keystone"), Kenneth Noel, and Anna Noel (collectively, the "Keystone Defendants"). As related matters, the Generator Defendants also filed motions: (1)

to amend their deemed crossclaim against the Keystone Defendants[1] to assert a state law claim for fraudulent conveyance under 39 P.S. Section 351 *et seq.*, and 12 Pa.Cons.Stat. Ann. Section 5101–5110 *et seq.*; (2) to join as additional defendants to that crossclaim the Noels' four adult children, the separate Trusts created for each of the four children, the Noel Family Trust, Trustee Mary Keller (Anna Noel's sister), and the Flatbush Golf Course, Inc., which formerly was owned by the Noels, but is now in trust for their children; and (3) for a preliminary and permanent injunction against these additional defendants to prevent further conveyances and dissipation of the assets, and to compel the return to Keystone and the Noels of fraudulently conveyed property.

The basic facts underlying the litigation have been set forth in previously published memoranda. An understanding of the instant decision will benefit from a brief reiteration of basic CERCLA law, along with a thorough explanation of the labyrinth of facts, motions, and rulings that are intertwined with this request for injunctive relief.

## II. *Procedural History*

On September 27, 1993, the United States initiated this CERCLA action to recover costs expended by the Environmental Protection Agency (EPA) in responding to the contamination of the Keystone Sanitation Landfill Site up until September 27, 1990. The complaint also seeks a declaratory judgment of the liability of the Defendants for future response costs that will be incurred in implementing remedial action at the Site. Pursuant to CERCLA's § 107(a) framework, the United States named eleven Defendants as potentially responsible parties (PRPs). Eight of the original PRPs—those referred to as the "Generator Defendants"—were

joined under § 107(a)(3), on the theory that they contracted, agreed, or otherwise arranged to dispose of hazardous waste at the Keystone Site or transport such waste to the Site. These Generator Defendants are represented by Liaison Counsel. The other three original PRPs—those referred to as the Keystone Defendants, were joined under § 107(a)(1), (2), and/or (3) as the owners or operators of the Keystone Site and as arrangers and transporters of waste to the Site. The Keystone Defendants are represented by the law firm of Reed, Smith, Shaw & McClay.

In August 1994 the Generator Defendants joined numerous Third–Party Defendants as additional PRPs. These Third–Party Defendants are represented by Liaison Counsel, with the exception of Waste Management of Pennsylvania, Inc. (Waste Management).[2] The Third–Party Defendants, in turn, are now in the process of identifying numerous Fourth–Party Defendants for joinder in the near future.

Under CERCLA's strict liability scheme, each original PRP found to have transported any amount of hazardous waste to the Keystone Site is subject to joint and several liability to the United States regardless of relative responsibility, unless a PRP can show that its harm was divisible. *See Tippins Inc. v. USX Corp.*, 37 F.3d 87, 92 (3d Cir.1994); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 257–58 (3d Cir.1992) (citations omitted). It follows that, in theory, the United States could recover the full amount of any ultimate judgment from any one liable PRP. As a practical matter, in most CERCLA § 107(a) actions, liability is eventually apportioned among all liable original and additional PRPs through the contribution action available under CERCLA § 113(f)(1) or, more likely, through settle-

---

1. In its initial case management order, the court deemed all original Defendants to have asserted contribution and indemnification crossclaims against one another.

2. Waste Management interests are set apart from those of the other Third–Party Defendants because not only has it been joined as a PRP in its own right, it is also the purchaser of Keystone's assets, and so is at the center of a successor liability dispute in this action. The successor

liability issue is to be resolved by this court upon completion of discovery on the matter, which was one of the few categories of discovery permitted during the settlement period established by this court's March 21, 1995, order. A recent submission from Waste Management indicates that the discovery will be completed in approximately mid-August, after which the parties are due to submit a proposed schedule for addressing the issue.

ment procedures that encompass equitable contribution principles. Nonetheless, the prospect that a PRP which should bear a substantial share of the ultimate liability will be unable to do so is of serious concern to other CERCLA Defendants.

With this liability scheme confronting them, the Generator Defendants requested this court to grant them injunctive relief based on allegations that the Keystone Defendants have transferred and will continue to transfer Keystone and personal assets to the Noels' adult children or other relatives, or to the children's trusts, for the purpose of removing the assets from the reach of this litigation. Allegations to this effect have been voiced for some time, and it is worth tracking the sequence of motions, conferences, and orders that have addressed the allegations to date.

To begin with, on August 12, 1994, the court approved a stipulation whereby Keystone itself was enjoined from transferring any of its assets pending the outcome of this litigation, with the exception that Keystone could, *inter alia*, make payments to the Noels in the ordinary course of business, as defined therein. This stipulation did not address the transfer of the Noels' personal assets, or any conveyances by the Keystone Defendants that might have occurred prior to the entry of the stipulation. The Noels refused to sign a stipulation that would limit the amount they could take from Keystone for themselves, or prevent them from disposing of assets previously taken from Keystone after the initiation of the EPA's investigation of the Keystone Site.

On August 24, 1994, the court first addressed the allegations of ongoing dissipation of assets, when it held an in-person conference with counsel for the Generator Defendants, and counsel for the Keystone Defendants. At that conference, the Generator Defendants directly alleged that after the EPA commenced its investigation of the Keystone Site, the Noels commenced a plan to divest themselves and Keystone of assets for the specific purpose of escaping any share of the response costs sought by the United States. The immediate goal of the Generator Defendants at that point was to obtain re-

sponses from the Keystone Defendants to discovery requests directed to the Noels' personal finances, the sale of Keystone assets to Waste Management of Pennsylvania, Inc., and the disposition of those proceeds and other sums of money, for the time period between 1990 and August 1994. The Generator Defendants questioned whether the Noels' transferred to themselves proceeds from the sale to Waste Management, or other assets from Keystone. They also questioned the Noels' transfers of funds to their adult children. The Noels refused to respond to the requests, claiming that such information would be pertinent, if ever, to the execution of any eventual judgment, and that requiring the Noels to produce it would be burdensome and invasive of their privacy at that point.

The court disagreed, and on August 26, 1994, issued a memorandum and order directing the Noels to respond to the discovery requests. The court reasoned that one of CERCLA's primary goals was to ensure that those who cause or profit from contamination of the environment will bear the costs of clean-up. As owners of the Keystone Site, the Noels are likely to be held liable for a substantial share of all approved response costs, so the court found it preferable to learn at that time whether there was any merit to the allegations about dissipation of assets. Therefore, the court ordered the Noels to respond to discovery requests directed to the transfer of their personal assets since 1990, the sale of Keystone assets to Waste Management, the disposition of any of the stock and cash received through the sale to Waste Management, and the Noels' financial dealings with Keystone. The court further directed the Keystone Defendants to submit a detailed statement of any privilege claimed in response to the discovery requests. The parties then proceeded with discovery on the assets issue, and the Keystone Defendants did produce certain documents.

Another major dispute arose in October 1994, however, when the Generator Defendants wrote to the court concerning the Keystone Defendants' refusal to provide unredacted attorney billing statements that allud-

ed to their transfers of assets. The Keystone Defendants refused to provide them on the grounds of the attorney-client privilege and work product doctrine, but the Generator Defendants maintained that the Keystone Defendants waived any privilege by inadvertently producing printouts of electronic mail messages between attorneys at the law firm of Reed, Smith, Shaw & McClay. These printouts strongly suggested that the attorneys had actively advised the Keystone Defendants how to take assets out of Keystone at a significant point in the EPA's activities at the Keystone Site.

On October 19, 1994, the court ruled that due to the inadvertent disclosures, the Keystone Defendants had waived any privilege that might have protected their attorneys' billing statements from disclosure, but narrowly interpreted the waiver to reach only billing statements that referenced narratives and identities of attorneys related to the Keystone Defendants' disposition of assets since 1990. Accordingly, the court directed the Keystone Defendants to produce in unredacted form all attorney billing statements concerning legal services related to any transfers of assets discussed in the court's August 26 order.

The Keystone Defendants did not produce the billing statements but, instead, moved for reconsideration of the order. About the time that motion became ripe, the Generator Defendants filed their request for injunctive relief. The court scheduled an injunction hearing for January 20, 1995, and meanwhile proceeded with the motion for reconsideration. On January 13, the day the court was completing its memorandum on that motion, the parties contacted the court with yet another discovery dispute revolving around the assets issue. The deposition of Anna Noel was being taken for the preliminary injunction hearing, and the Generator Defendants had asked Mrs. Noel about any communications between her and her accountant and/or her attorneys related to the disposition of the assets of Keystone and the Noels. Her counsel asserted an accountant/client privilege, as well as the attorney/client privileges.

After conducting a conference call to discuss the dispute, the court issued the January 13 memorandum, which addressed both the motion for reconsideration and the privilege claims asserted in Anna Noels' deposition. Adhering to its October 19, 1994, ruling, the court again directed the Keystone Defendants to produce the billing memoranda, and further ruled that the same waiver applied to the deposition questions directed to Anna Noels' communications with her attorneys about the transfer of Keystone and personal assets. As to the accountant, the court held that federal common law applied to the issue, and there was no federal accountant/client privilege.

The Keystone Defendants then asked the court to stay the January 13 ruling insofar as it addressed the attorney/client privilege, while they petitioned the Third Circuit Court of Appeals for a writ of mandamus. The court complied, but the Third Circuit denied the mandamus petition by order dated May 12, 1995. The Keystone Defendants then made a request for either panel or *en banc* rehearing. The Third Circuit refused and issued its mandate on the matter on June 19, 1995. Still resolute, the Keystone Defendants moved this court to continue the stay of its October 19, 1994, and January 13, 1995, orders, while they petitioned for a writ of certiorari to the United States Supreme Court to appeal the Third Circuit's denial of mandamus. The briefing on this latest motion to stay was completed on July 10, 1995, and the court will address it at the end of this memorandum.

Meanwhile, the court had conducted the preliminary injunction hearing on January 20, 1995, which was a consolidated hearing for purposes of the requests for injunctive relief against the Keystone Defendants and the proposed additional crossclaim defendants. The hearing had to be abbreviated due to this court's urgent personal matter. Therefore, the parties agreed to submit the hearing testimony of Anna Noel by deposition. This deposition was taken on January 30, 1995, transcribed, and submitted to the court on February 14, 1995. Thereafter, the parties submitted proposed hearing exhibits as well as additional briefs and correspondence on the issues.

Shortly thereafter, the court held the case management conference of March 17, 1995. At that conference, the court and the parties discussed the management of the Third–Party action, settlement efforts, and the question of judicial review and discovery regarding the EPA's Record of Decision and the administrative record. The result was that a period of time was set aside to focus on settlement. Counsel for the Keystone Defendants represented that the status quo would not change with respect to the assets of the Keystone Defendants, the Noels, and their children. Therefore, consideration of the request for injunctive relief was set aside for a time.

The settlement period now has ended. The court recently ruled on the issue of discovery beyond the administrative record, and in the near future the court will embark upon judicial review of the ROD and administrative record. The Keystone Defendants have suggested that a decision on the ROD is necessary before any decision can be made with respect to the Generator Defendants' request for injunctive relief. The court does not agree that consideration of the request for injunctive relief need be delayed any further, and will now address it.

### III. *Discussion*

#### A. *The Law*

■ The threshold issue here is whether a district court has the authority to enjoin a defendant from dissipating assets on the grounds that it is necessary to ensure the ability of the defendant to satisfy a money judgment against it. The court finds that there is such authority, although any encumbrance must be reasonably related to the amount of the ultimate potential judgment. *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 194–97 (3d Cir.1990); *see also In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467–1480 (9th Cir.1994).

■ A party seeking such relief must first satisfy the well-established preliminary injunction standards. These standards include: (1) a reasonable likelihood of success on the merits; (2) irreparable injury to the movant if the injunctive relief is not provided; (3) a showing that the grant of injunctive relief will not result in greater harm to the nonmoving party than the denial would visit upon the moving party; and (4) a showing that granting the injunction would serve the public interest. *See Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir.1994); *Hoxworth v. Blinder*, 903 F.2d at 197–98.

■ The Keystone Defendants have made no effort to deny that transfers of assets occurred. They urge, instead, that any transfers were proper and, more important, that the court lacks authority to enjoin any assets in the possession of the Noels or the proposed additional crossclaim defendants. The Keystone Defendants place considerable emphasis on the language in *Hoxworth* requiring a determination of a "reasonable relationship" between the amount and type of encumbered assets and the expected recovery. They suggest that the Generator Defendants must establish the Keystone Defendants' likely share of liability with precision, as well as the likely inadequacy of their assets to satisfy such liability, and they say that the Generator Defendants cannot do so at this stage of this litigation. They further propose that the Generator Defendants cannot deny liability to the United States, as they have done in certain pleadings and discovery materials, and yet establish a likelihood of harm by being subject to a disproportionate share of CERCLA liability to the United States.

As a corollary, the Keystone Defendants maintain that in order for this court to make an acceptable determination of any party's potential liability for purposes of these injunction proceedings, it must first complete its judicial review of the ROD and rule on whether the costs and expenses claimed by the EPA will, in fact, be assessed against any of the Defendants in this case. In that regard, the Keystone Defendants claim that the only potential liability that is ascertainable at this point amounts to approximately $500,000.00—that is, the approximate $1.4 million actually spent by the EPA on the Keystone Site to date, minus the amount already recovered through the *de minimis* consent decree entered in the related *United*

*States v. Borough of Lemoyne,* 4:CV–93–0667 (M.D.Pa.1994). In sum, their position is that other than this $500,000.00 in past response costs, neither their CERCLA liability, nor that of the Generator Defendants, is sufficiently ascertainable to satisfy *Hoxworth.*

The court does not read *Hoxworth* as requiring so precise a calculation of potential damages. In *Hoxworth,* the Third Circuit simply made it clear that a preliminary injunction is appropriate where there are extraordinary circumstances indicating that one is necessary to preserve a damages remedy. The *Hoxworth* court's caveat was that such relief is never appropriate without an attempt to ensure that the value of the assets encumbered bears some reasonable relationship to the likely amount of plaintiff's expected recovery, and without a determination that an unsatisfied money judgment would constitute irreparable injury to the party seeking the injunction. The *Hoxworth* court also indicated that the property to be encumbered should be the same as that which would be subject to any liability at issue in the case. The *Hoxworth* court vacated the injunction entered in that case because the district court had made no such determinations.

In applying *Hoxworth* to a CERCLA action, the only sensible approach is to consider CERCLA's strict, joint and several liability, the costs estimated in the ROD, the identity of the PRP against whom injunctive relief is sought, and the property sought to be encumbered and its relationship to the CERCLA action. From there, the court can determine whether to encumber any of the PRP's assets and, if so, how much would bear a reasonable relationship to the ultimate potential liability of the PRP. The court does not believe that *Hoxworth*'s "reasonable relationship" requirement encompasses a precise calculation of each party's ultimate CERCLA

liability, a determination that necessarily is made well into any CERCLA cost recovery litigation. If that were the case, *Hoxworth* could never be applied to prevent the dissipation of a CERCLA defendant's assets.

■ The Keystone Defendants' suggestion that judicial review of the ROD must be completed prior to encumbering any assets is untenable. Judicial review of the ROD is likely to be the most time-consuming and demanding endeavor the court will undertake in this litigation. The court cannot disregard the specter of the Keystone Defendants' dissipation of assets until it is completed. Of course, in theory, the $11.9 million quoted by the EPA could be reduced if judicial review of the ROD reveals arbitrary and capricious spending or remedy selection on the part of the United States. Without suggesting that the court will do anything less than a thorough judicial review, it must be conceded that given the substantial judicial deference owing to the EPA's decisions in these matters, most cases will not result in clean-up costs that are a fraction of the EPA's estimated costs, as the Keystone Defendants suggest is possible here.

In sum, the demonstrated threat that one PRP will dissipate its available assets and thereby saddle other CERCLA PRPs with a disproportionate share of liability can provide sufficient grounds for the grant of injunctive relief to preserve a pool of assets for payment of damages. The availability of such relief would be meaningless, if it were precluded pending resolution of the review of the ROD and application of CERCLA's joint and several liability and contribution schemes. A court must rely on the costs set forth in the ROD in evaluating a request for injunctive relief, absent some obvious reason to believe that they cannot be accurate. The court finds no such obvious reason here.[3]

---

3. A decision from another district court in this circuit lends support to this court's decision. *See In re Tutu Wells Contamination Litigation,* 157 F.R.D. 367 (D.V.I.1994) (in CERCLA case, district court granted request of PRPs to enjoin a Delaware state court proceeding, which would have distributed trust set up for dissolved corporate PRP before final decision could be reached in CERCLA case; potential judgment by Delaware court permitting distribution of assets and possible exhaustion of assets and extinction of civil life of corporation was valid concern of other PRPs; PRPs might then be deprived of possibility of recouping dissolved PRP's assets for use in paying response costs of the cleanup, which would increase other PRPs' liabilities for response costs); *see also In re Tutu Wells Contamination Litigation,* 885 F.Supp. 776 (D.V.I. 1995) (in same case, court entered permanent injunctive relief).

Here, the United States has estimated that the final bill for the clean-up will be approximately $11.9 million, and this court has tentatively accepted that figure for purposes of approving the *Borough of Lemoyne* consent decree. That decree was approved on the theory that the nearly $1 million dollars the United States would obtain from the *de minimis* PRPs would represent their fair and reasonable contribution to that $11.9 million dollars. The Keystone Defendants' suggestion that they, who owned and profited from the operation of the Keystone Site for nearly twenty-five years, might simply be required to split another $500,000.00 in clean-up costs with the other Defendants approaches absurdity. As the Generator Defendants accurately noted, owner/operators of waste facilities are frequently assessed forty to fifty percent of the total costs of clean-up efforts.[4] Furthermore, while it is true that the EPA has incurred only $1.4 million in past response costs to date, the court's preliminary examination of the ROD precludes a serious contention that there is no need for further remedial work at the Site, or that the costs of such work will be minor.

Thus, the Generator Defendants have succeeded in showing a reasonable likelihood that the Keystone Defendants and the Generator Defendants will be held strictly, jointly and severally liable for the $11.9 million remedy ultimately designed by the EPA for the Keystone Site, that in a contribution action the Keystone Defendants will be assessed a significant share of that amount, and that it would be assessed against the cash and other assets in the possession of Keystone and the Noels. The question remains whether the Generator Defendants have shown that the Keystone Defendants' transfers of their assets since 1990 is reasonably likely to preclude their satisfaction of any CERCLA liability judgment, thus exposing the Generator Defendants to a threat of irreparable harm absent court action to recover some or all of the assets and enjoin their further disposition. The court turns to the evidence introduced at the preliminary injunction hearing to answer those questions.

## B. *The Evidence*

In connection with their motion for preliminary injunction against the Keystone Defendants, the Generator Defendants submitted an "appendix," which partly documented the Keystone Defendants' transfer of Keystone assets to themselves and then to their four adult children, the Trusts created for them, the Flatbush Golf Course, Inc., and Mrs. Noel's sisters. At the preliminary injunction hearing, the Generator Defendants introduced an additional four volumes of evidentiary materials which elaborated on this theme.[5] Keystone also submitted exhibits, both at the hearing and subsequent to it, with its post-hearing brief.[6]

Volume 1 of the Generator Defendants' exhibits contains tax returns from 1989 to 1993 for the Noels and Keystone; tax returns from 1988 to 1993 for the Flatbush Golf Course, Inc.; tax returns from 1991 to 1993 for the Brian K. Noel Separate Trust; and 1990 gift tax returns for Kenneth and Anna Noel. These tax returns show an enormous increase in the salary, bonuses, and dividends

---

**4.** The court does not mean to suggest that the Keystone Defendants are certain to be held liable for that portion here.

**5.** Some documents contained in the four volumes of exhibits introduced at the hearing are repetitive of those submitted with the appendix. Where that is the case, the court refers to the documents as they appear in the four volumes.

**6.** In correspondence sent to the court, the Generator and Keystone Defendants squabbled over the admissibility of the Keystone Defendants' exhibits. Many of the Keystone Defendants' exhibits consisted of the pleadings already of record before this court, and the Generator Defendants' discovery responses in other contexts in this liti-

gation, and apparently were being offered to support the Keystone Defendants' point that by taking contrary positions earlier in this matter, the Generator Defendants are precluded from showing the likelihood that they or the Keystone Defendants will be exposed to liability in this matter. The court is quite unpersuaded by that point. In any case, the court will not belabor the admissibility of the exhibits, given the nature and circumstances of these proceedings, and the fact that the Generator Defendants' objections are based largely on relevance. The court considered all exhibits submitted by all parties, and this memorandum demonstrates that its decision is premised on relevant and properly admitted exhibits.

taken by the Noels from Keystone in 1990 and 1991, as compared to other years.

Volume 2 contains Keystone's 1990 financial statement, which reflects the payment of a cash dividend in the amount of $1.4 million dollars in that year (this shows up in Kenneth Noels' 1990 income tax return in Volume 1); the 1990 financial statement of the Noels, which does not reflect the $1.4 million dividend; a 1990 appraisal of Flatbush Golf Course; a December 31, 1990 irrevocable trust agreement creating the Noel Family Trust; a December 31, 1990 Noel Family Trust determination establishing separate trusts for the four adult children of the Noels; an election by the separate trust set up for the Noels' son, Brian, to allow the trust to be a shareholder in the Flatbush Golf Course; a December 31, 1990 employment agreement between Flatbush and Anna Noel, pursuant to which she was to be paid $150,000.00 to perform unspecified duties; copies of checks drawn on the accounts of Kenneth and Anna Noel evidencing over two hundred and eighty thousand dollars in cash gifts to the Noels' four children in a three-year period between January 1991 and February 1994; the e-mail messages between Reed, Smith attorneys suggesting advice to the Noels about taking money out of the corporation; three checks, each dated August 26, 1991—a "dividend check" drawn against Keystone's account for $1.1 million dollars payable to Kenneth Noel, a check drawn against the Noels' personal account for $1.1 million payable to Flatbush, and a check drawn against Flatbush's account for $933,507.17 payable to Farmers Bank and Trust Company; minutes from an August 6, 1991, and a December 31, 1991 meeting of the Keystone board of directors (i.e., the Noels), authorizing $600,000.00 and $200,-000.00, respectively, in cash bonuses from Keystone to themselves as officers of the corporation; closing documents for the $67,-000.00 purchase of Florida property in 1993, by the Noels and their four children; and work papers from Flatbush's CPA showing, *inter alia*, that Kenneth Noel loaned Flatbush $80,000.00 in 1990.

Volume 3 of the Generator Defendants' exhibits contains a 1986 letter from the EPA notifying Kenneth Noel of his and Keystone's potential liability for the clean-up costs of the Site; a 1988 letter informing Kenneth Noel and Keystone of their opportunity to participate in the development of a Remedial Investigation (RI) and Feasibility Study (FS) for the Site; the EPA's July 1990 final RI for the Site; the EPA's ROD; EPA's December 5, 1990, notice letters to Keystone and the Noels informing them again of their potential liability for the clean-up of the Site, and informing them of their opportunity to perform the Remedial Design and Remedial Action (RD/RA) called for in the ROD; and EPA's June 28, 1991, administrative order under § 106(a) of CERCLA, directing the Keystone and Generator Defendants to perform the RD/RA called for in the ROD. These documents show that the Noels became aware in late 1990 of the actual amount of clean-up costs the United States would seek in connection with the Site.

Finally, Volume Four contains various financial and tax summaries prepared by one Brooks Gracie, the Generator Defendants' financial and tax expert, regarding Keystone, the Noels, and Flatbush. The final exhibit in Volume Four is Mr. Gracie's expert report. The expert report states, in sum, that the Noels conducted a scheme to transfer assets from Keystone to themselves and then to their children, relatives, and Flatbush, for the purpose of avoiding potential liability for the clean-up of the Keystone Site, and that in doing so they substantially reduced the pool of assets available to satisfy any liability assessed against them or Keystone.

The documents in the Generator Defendants Volume 1 and 2 strongly support the Generator Defendants' claims of deliberate dissipation of assets by the Keystone Defendants. The three checks written on August 26, 1991, are particularly significant, especially when considered in light of other exhibits submitted in connection with the hearing. First, exhibit C to a brief submitted by Waste Management in this matter shows that the assets sale from Keystone to Waste Management was completed on June 18, 1991, pursuant to which Keystone turned over most of its operating assets to Waste Management in return for $3.1 million worth

of Waste Management stock. Second, the Generator Defendants submitted a Butcher & Singer statement with their original motion for preliminary injunction, which shows that on July 31, 1991, Keystone sold 30,000 shares of this Waste Management stock for $1,112,977.00 in cash. (*See* Appendix M to Generator Defendants' motion for preliminary injunction). Third, Keystone Exhibit 29 shows that at the August 26, 1991, meeting of the board of directors of Flatbush (i.e., the Noels), they approved a personal "loan" from themselves to Flatbush in the amount of $1.1 million, and further approved the use of $933,507.17 of that amount to pay off a loan from Farmers Bank and Trust Co.

Thus, there is a clearly traceable line from the sale of Keystone assets to Waste Management, to Keystone's sale of the Waste Management stock, to the infusion of the proceeds of that stock sale into Flatbush. Flatbush, of course, was given to the Noels' four children on December 31, 1990, through gifts made by each of the Noels to the individual trust set up for each child. (*See* Volume 1, exhibit 17 (1990 gift tax returns for Kenneth and Anna Noel); Volume 2, exhibit 3, at 2.) There is a strong likelihood that the wealth that was once vested in Keystone and the Noels is now largely contained in trusts for the Noels' children, while the Family Trust and the Noels' relationship to Flatbush as unsecured creditors suggests their continued control over the wealth.

The appraisal of Flatbush is also significant. It shows a computed value of $488,000.00 for Flatbush as of December 30, 1990. This value is based upon the following: the appraiser used the "income approach" for purposes of appraisal, which measures the net income produced or capable of being produced by a business. The appraiser stated that the income approach is appropriate for a going, profitable business. Using that approach, he estimated the business value of Flatbush to be $2,454.350.00, added cash and inventory available at the time, and subtracted liabilities in the amount of $2,073,481.00, to arrive at a rounded computed value of $488,000.00. He then calculated the per share value, based on a total 5,000 shares of stock. (*See* Volume 2, exhibit 3, at 4–8.)

However, in light of the additional evidence showing that the Noels "loaned" money to Flatbush, which was used to pay off more than $1 million in liabilities, the "income approach" appraisal of Flatbush is likely to be considerably higher now. In addition, the market or liquidation value is likely to be significantly higher, given that the golf course encompasses 178 acres of land, a clubhouse with pro shop, bar and grille, and locker room. Thus, the court finds it reasonably likely that Flatbush is holding a substantial portion of the Noels' and Keystone's former wealth.

The evidentiary value of the documentary evidence is heightened by Anna Noel's deposition testimony. As noted previously, the testimony of Ms. Noel was taken by deposition and submitted to the court after the preliminary injunction hearing. Ms. Noel admitted in that deposition that she and her husband owned and controlled Keystone and Flatbush. She indicated that the personal worth of her and her husband was approximately $4.5 million as of December 31, 1990, which included over $400,000 in cash. She further admitted that their available cash was substantially lower as of January 30, 1995, because they had given away in excess of $300,000.00 since 1990.

Anna Noel also confirmed that as of December 31, 1990, Keystone was worth over $2.2 million, that she and her husband sold Keystone's operating assets to Waste Management for $3.1 million, and that today Keystone's only value is approximately $1.1 million in stock. She conceded that she and her husband took enormous sums out of Keystone in dividends and bonuses after 1990, and she conceded that they "lent" money to themselves from Keystone, and then "lent" it to Flatbush without requiring Flatbush to sign any loan documents. She confirmed that she and her husband gave Flatbush to the trust for her children. (Dep. of Anna Noel, at 64–87, 103.) [7] Mrs. Noel stated that

---

7. *See* Keystone Exhibit 29, which shows the $1.1 million dollar loan from the Noels to Flatbush, as well as a $600,000.00 loan from themselves to

Flatbush in October 1990, $471.270.93 of which was earmarked to pay off Flatbush's loans at Farmers Bank and Trust Co. The remainder of

she and her husband appointed her sister Mary Keller as trustee of the Family and individual trusts, which included responsibility for managing Flatbush, and more or less acknowledged that her sister had no experience in such matters. She also acknowledged that despite giving Flatbush to the trusts, she and her husband gave back to themselves approximately $900,000.00 in employment contracts, which they have not received, but remain entitled to as creditors of Flatbush. (Dep. of Anna Noel, at 97–100.)

Most important, although she doggedly evaded the questions put to her, Mrs. Noel ultimately conceded in essence that she was aware that the United States would be able to obtain large sums of money from her, her husband, and Keystone, and that knowing that, she put as much money as possible into trusts for her children. She repeatedly expressed the view that the government was trying to take away what she and her husband had worked a lifetime to build, and that it was only natural to try to protect those assets. (*See* Dep. of Anna Noel, at 88–97.)

The documents and Mrs. Noel's testimony satisfy the court that the Generator Defendants are likely to succeed in showing that the Keystone Defendants have transferred and will continue to transfer assets to avoid paying a potential CERCLA judgment, that they will be without funds to satisfy a CERCLA judgment absent injunctive relief, and that the Generator Defendants are likely to suffer irreparable harm of being saddled with the Keystone Defendants' share of joint and several liability if injunctive relief is not granted. All of this outweighs any harm that might come to the Keystone Defendants through a reasonably tailored injunction. Furthermore, the court finds that it is in the public interest to locate and preserve a reasonable pool of Keystone Defendant assets to satisfy any judgment against them.[8] Accordingly, the court finds that the Generator Defendants have satisfied their burden for

obtaining injunctive relief against the Noels and Keystone.

### C. *The Motions to Amend Crossclaim Against Keystone Defendants and Join Additional Defendants in Crossclaim and Enjoin Additional Defendants*

■ To facilitate their efforts at bringing the dissipation of assets issue before the court, the Generator Defendants seek leave to amend their cross-claim against the Keystone Defendants to assert a Pennsylvania state law claim for fraudulent conveyance. Whether or not to grant a motion to amend is governed by Federal Rule of Civil Procedure 15(a), and the choice is within the sound discretion of the trial court. *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984). As Rule 15(a) itself directs, leave to amend "shall be freely given when justice so requires." This direction is to be liberally construed. *See Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982). A key consideration is whether the non-movant will be prejudiced by the amendment. *Id.* Denial of leave to amend may be required where there has been undue delay or other improper or bad faith conduct by the party seeking to amend, or where it is apparent that the amendment would be futile, as in, for example, the inability of the amendment to withstand a motion to dismiss. *Coventry v. United States Steel Corp.*, 856 F.2d 514, 519 (3d Cir.1988) (citation omitted); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 125 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

■ Without belaboring the issue, the court perceives no prejudice or futility in permitting the amendment in this instance. Allowing amendment to assert the fraudulent conveyance claim is well within the scope of

---

that exhibit shows that the Noels' four adult children are now the shareholders of Flatbush, and that the Noels themselves are its Board of Directors, thus retaining control over the corporation.

8. The Keystone Defendants asserted that the public does not have an interest in ensuring that specific responsible parties assume the cost of environmental clean-up, but are interested only in ensuring that some one bears those costs. The court does not agree.

Federal Rule of Civil Procedure 15. Furthermore, doing so provides an additional vehicle for bringing into this litigation the full range of issues pertinent to dissipation of assets.

 The court is also satisfied that the joinder in the fraudulent conveyance crossclaim of the Noel Family Trust, the individual trusts set up for the Noels' children, the Flatbush Golf Course, the Trustee of the trusts, and the Noel children in their individual capacities, comports with Federal Rule of Civil Procedure 13(h), and its incorporated standards of Federal Rule of Civil Procedure 19. Under Rule 19(a)(1), a court may join a person to an action if in the person's absence complete relief cannot be accorded among the existing parties. The court does not believe that complete injunctive relief can be afforded the Generator Defendants without the joinder of these individuals and entities as additional crossclaim Defendants.

It follows that enjoining the joined crossclaim Defendants in some fashion is necessary to effectuate the injunctive relief to which the Generator Defendants are entitled. Given the relationship of these additional crossclaim Defendants to the Keystone Defendants, and the apparent lack of boundaries between the Keystone Defendants' assets and those of the additional crossclaim Defendants, they must be enjoined in order to reach certain assets disposed of by the Keystone Defendants. Absent some form of injunctive action against the additional crossclaim Defendants, the Generator Defendants will remain at risk of being burdened with the Keystone Defendants' share of the liability for clean-up costs at the Site. The goals of CERCLA will best be served by joining these proposed additional Defendants.

The court will not permit joinder of or injunctive relief against Mary Keller in her individual capacity, or Theresa Keller, as they appear to have received only a minor portion of the Noels' transferred wealth.

## D. *Scope of Injunctive Relief*

 The question of the proper scope of injunctive relief remains. The Generator Defendants request a complete encumbrance of all of the personal and corporate assets within the reach of the Noels and Keystone, as well as all assets once owned by the Noels or Keystone and now in the possession of Flatbush, the trusts, the Noels' four children, or Anna Noel's sisters. The court does not find that such extensive injunctive relief is necessary to protect the Generator Defendants from their threatened harm, given the maximum potential $11.9 million in liability, the number of other PRPs in this case, the likelihood that the Keystone Defendants would not be held liable for more than fifty percent of the total liability, and the court's belief that Keystone and Flatbush are now capable of providing close to that amount to satisfy any judgment against the Keystone Defendants. Therefore, the injunction entered herein will reach only those assets now held by Keystone, Flatbush, and the trusts.

The court's decision rests upon the apparent fact that the Noels are very substantial creditors of Flatbush. By enjoining Flatbush until further notice from repaying loans to the Noels or paying large sums that may be due on their $900,000.00 in employment contracts, these substantial funds will be protected from dissipation. The court also will enjoin the transfer of any other Flatbush funds to the Noels, their children, or any other entity outside the ordinary course of business until further notice. The injunction will preclude any increase in salaries from Flatbush or the trusts to any Noel family member without permission of the court. The court will require the Keystone Defendants to submit a current financial statement as to the Flatbush Golf Course, Keystone, and the trusts immediately. Upon receipt of the financial statements, the court will decide whether and how to remove the cash representing the Noels' loans from Flatbush and preserve it for the payment of any potential judgment entered against the Noels. If the court's estimation of the total encumbered assets is erroneous, it will reconsider the amount encumbered. In the meantime, the instant injunction will preserve the status quo. To go further and enjoin the Noels' other personal assets would be overreaching, at least at this point.

For similar reasons, only the transfer of assets from the Noel Family trusts and the children's separate trusts will be enjoined at this time. For now, Flatbush is in the possession of the trusts, and therefore, their joinder is appropriate, along with the Trustee in her official capacity. The court declines to compel the return of the series of $20,000.00 cash payments made to the Noel children and Anna Noel's sisters, or otherwise further encumber the personal assets of these additional defendants. The Noel children shall, nonetheless, be joined as additional Defendants in the fraudulent conveyance claim, as it may be that further action will be necessary. Although the court will not enjoin Mrs. Noel's sisters or the Noel children in their individual capacities, all parties are cautioned that the court will reconsider this decision if necessary.

In sum, the court will permit joinder in the fraudulent conveyance of all proposed additional defendants except Mary Keller and Theresa Keller is individuals. The court will enjoin all the Keystone Defendants and additional Defendants from any transfer or encumbrance of the assets or value of Keystone, Flatbush, or the trusts until further notice, but will permit the Keystone Defendants to suggest a mechanism for addressing the disbursal of ordinary business expenditures and salaries from Flatbush to the Noels and their children.

### E. *Related Motions and Requests*

Several other matters must be addressed at this time. First, the United States submitted a memorandum supporting the Generator Defendants' motion for injunctive relief, but requesting the court to confirm the priority of the United States' claims against any encumbered assets. An order to that effect will be superfluous, given CERCLA's liability scheme. Nevertheless, the court will craft its order in this matter so as to reassure the United States.

■ Second, Waste Management also submitted a memorandum supporting the Generator Defendants' motion for injunctive relief, but requesting the court to clarify that the Keystone Defendants will not be precluded as a matter of law from making certain payments to Waste Management pursuant to indemnification provisions contained in the Keystone/Waste Management assets sale agreement. Waste Management emphasizes that nothing in CERCLA's liability scheme precludes indemnification agreements between a PRP and another party. This is undoubtedly true, but it skirts the question of whether the court should allow an indemnified PRP to assert what would be essentially a priority of claim over the United States and other PRPs.

Waste Management cites a number of cases, which turned out not be instructive for the question at hand. The court believes, in any case, that Waste Management's position is fundamentally at odds with CERCLA's liability scheme, which provides that the Keystone Defendants will be liable, if at all, strictly to the United States, and jointly and severally with the other PRPs. The fact that CERCLA does not preclude indemnification agreements does not mean that CERCLA ensures a properly indemnified PRP that it will have a priority of interest in the indemnifying PRP's available assets.

To the extent that Waste Management might attempt to characterize its demands for indemnification as payments made in the ordinary course of business under the parties' August 12, 1994, stipulated preliminary injunction, it will be required to submit each claim for approval as required by that stipulation. The court will not enter a blanket order on behalf of Waste Management.

■ Third, the court will dispose of the Keystone Defendants' motion to continue the stay of this court's October 19 and January 13 orders concerning production of their attorneys' billing statements, pending the outcome of their writ of certiorari to the United States Supreme Court. Quebecor responded to this motion, arguing vociferously that lifting the stay was essential to permit the Generator Defendants to obtain additional information to support their dissipation of assets theory. Given the instant ruling, the court does not perceive an urgent need for those documents, and prefers to let the ruling run the course of appeal. Nonetheless, the court does not believe that the Keystone

Defendants have satisfied their burden in this matter. A court should stay an order pending the outcome of a petition for writ of certiorari where there is: (1) a reasonable probability that certiorari will be granted; (2) a significant possibility that the judgment below will be reversed; and (3) a likelihood of irreparable harm if the judgment is reversed, and is not stayed. *See Barnes v. E–Systems, Inc.,* 501 U.S. 1301, 1302, 112 S.Ct. 1, 2, 115 L.Ed.2d 1087 (1991). The Keystone Defendants have not demonstrated any of these three requirements. Most obviously, they cannot show the likelihood of irreparable harm. The court's orders compelling production of the attorney billing statements were very narrowly tailored. If, in fact, there are billing statements tending to show that the attorneys advised the Keystone Defendants to take assets out of the corporation in light of the potential for CERCLA liability, it is other parties who stand to suffer irreparable harm, not the Keystone Defendants.

In any case, as to the other two factors governing the request for stay, the court found no compelling indication in the cases cited by the Keystone Defendants to suggest that this court's order is likely to be overturned. The court has been most patient and generous in granting stays to the Keystone Defendants on this matter up to this point, and finds that with the disposition of the preliminary injunction matter, and the pending judicial review, and the impending need to consider permanent injunction relief in this matter, the time is ripe to complete the discovery on this issue. Accordingly, the Keystone Defendants' June 21, 1995, motion to stay will be denied.

■ Finally, the Generator Defendants have asked to be excused from posting a bond for the preliminary injunction. That requirement is waived only in extraordinary circumstances, and the court sees no grounds for doing so in this case, especially where it will be shared among eight Defendants.

## IV. *Conclusion*

The Generator Defendants' motions for injunctive relief and all related motions and requests, along with the Keystone Defen-

dants' motion to stay production of documents, will be disposed of in accordance with this memorandum. An appropriate order will be entered.

## *ORDER*

And now, in accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

(1) The Generator Defendants' motion to amend cross-claim against Keystone Defendants is **GRANTED;**

(2) On or before August 31, 1995, the Generator Defendants may assert a fraudulent conveyance crossclaim against the Keystone Defendants;

(3) The Generator Defendants' motion to join additional defendants to amended cross-claim is **GRANTED in part and DENIED in part;**

(4) The Generator Defendants may join only the following entities and individuals as additional Defendants to the fraudulent conveyance cross-claim: Flatbush Golf Course, Inc.; The Noel Family Trust; the Bart F. Noel Separate Trust; the Brian K. Noel Separate Trust; the Lisa A. Noel Separate Trust; the Lori J. Noel Separate Trust; Bart F. Noel; Brian K. Noel; Lisa A. Noel; Lori J. Noel; and Mary E. Keller, in her capacity as Trustee;

(5) The Generator Defendants' motions for preliminary injunctive relief are **GRANTED in part and DENIED in part;**

(6) Subject to the conditions set forth herein, the Keystone Sanitation Company, Inc; Kenneth Noel; Anna Noel; the Flatbush Golf Course; the Noel Family Trust; the Bart F. Noel Separate Trust; the Brian K. Noel Separate Trust; the Lisa A. Noel Separate Trust; the Lori J. Noel Separate Trust; Bart F. Noel, Brian K. Noel, Lisa A. Noel, and Lori J. Noel; Trustee Mary E. Keller; and the officers, agents, employees, successors, and attorneys of Keystone Sanitation Company, Flatbush Golf Course, and the trusts named herein, are hereby enjoined until further notice from transferring, dissipating, encumbering, or otherwise adversely affecting the value of any cash, real or other

property, or any other assets now in the possession of Keystone Sanitation Company, the Flatbush Golf Course, or any of said Trusts, except as specifically permitted otherwise herein;

(7) The injunction set forth in paragraph (6), above, is immediately subject until further notice to an ordinary business exception parallel to that set forth in paragraph (2) of the August 12, 1994, stipulated preliminary injunction between Keystone and the Generator Defendants, which shall apply to the business of Flatbush Golf Course, and the named trusts, but which business exception is immediately further qualified as follows:

(a) Flatbush, its officers, agents, employees, successors, and attorneys, along with the additional Defendants trusts and Trustee, are hereby enjoined from repaying to Kenneth Noel and/or Anna Noel, in their personal capacity or otherwise, any loans made by either or both of them to Flatbush from 1990 to this date, or from paying any amount due on their $900,-000.00 in employment contracts, without express permission of this court;

(b) Keystone, Flatbush, the Trusts, their officers, agents, employees, successors, and attorneys, and Trustee Mary Keller are hereby enjoined from increasing the salaries of, or otherwise disbursing additional funds other than current salaries outside the ordinary course of business to Kenneth and Anna Noel, the four Noel children, or the Trustee, from Keystone, Flatbush, or the Trusts, without express permission of this court;

(c) The August 12, 1994, stipulated preliminary injunction between Keystone and the Generator defendants remains in effect, and nothing in this order shall be construed as meaning otherwise;

(d) The enjoined parties shall have until August 25, 1995, to submit to the court any additional stipulations or modifications necessary to allow Keystone, Flatbush, or the Trusts to continue to operate in the ordinary course of business;

(8) The Keystone Defendants, Flatbush Golf Course, and each named trust shall submit to the court and the Generator Defendants, on or before August 21, 1995, copies of their most recent financial statements, along with any and all information now known to them or capable of being known to them through reasonable diligence, reflecting changes in their financial status since the preparation of the most recent financial statement;

(9) The Court will not enjoin additional personal assets of Kenneth and Anna Noel or their children at this time, or in the future, unless the funds that can be preserved through the instant injunction appear insufficient or otherwise incapable of satisfying a CERCLA judgment against the Keystone Defendants;

(10) The court will address the following additional matters after August 25, 1995;

(a) the formation of a more specific stipulated preliminary injunction to address the expenditure of funds as necessary to meet the business expenses of Flatbush and the Trusts, including any salaries of the Noels and their children;

(b) a court-appointed Trustee to oversee the assets enjoined through paragraph 6, above;

(c) the question of permanent injunctive relief.

(11) The injunctive relief granted herein has been provided for the sole purpose of allowing the court to further determine whether and to what extent such assets must remain encumbered in order to ensure that the Keystone Defendants will be able to satisfy any joint and several liability to the United States and, secondarily, liability in contribution to the other PRPs, in this litigation;

(12) On or before August 21, 1995, the Generator Defendants shall post a bond with the Clerk of Court in the amount of $25,-000.00;

(13) Waste Management of Pennsylvania, Inc. is not entitled to routine disbursement from Keystone Sanitation Company, Inc. on the basis of indemnification, but shall submit each request separately in accordance with the August 12, 1994, stipulated preliminary injunction; and

(14) The Keystone Defendants' June 21, 1995 motion to stay production of documents is **DENIED,** and the Keystone Defendants shall immediately produce the documents in accordance with this court's October 19, 1994 and January 13, 1995 orders.